### MERSHON et al. v. SPRAGUE SPECIALTIES CO.

#### No. 3608.

District Court, D. Massachusetts.

April 2, 1936.

C. B. Townsend and Robert S. Dunham (of Cooper, Kerr & Dunham), both of New York City, and Robert Cushman and Robert L. Thompson (of Roberts, Cushman & Woodberry), both of Boston, Mass., for plaintiff.

Vernon M. Dorsey (of Dorsey & Cole), of Washington, D. C., and William J. Nolan and James R. Hodder, both of Boston, Mass., for defendant.

McLELLAN, District Judge.

This is a suit for infringement of two patents to Ralph D. Mershon, No. 1,141,-402 and No. 1,784,674. The first of these, a patent for improvements in electrolytic apparatus employing filmed electrodes, was issued on June 1, 1915, on an application filed on June 19, 1913. The second, a patent for film-formation and operation of electrolytic condensers and other apparatus, was issued on December 9, 1930, on an application filed on July 14, 1923. The first patent expired during the pendency of this suit, and as to it the plaintiffs seek only an accounting; as to the second patent they seek both an injunction and an accounting. The two plaintiffs are respectively the patentee and his licensee under the patents. The defenses are invalidity and noninfringement.

Statements of fact in this opinion are intended as findings of fact and statements of legal conclusions as rulings of law, under the equity rules.

So far as the present litigation is concerned, the two patents may be considered as patents for electrolytic condensers. The first patent seems to have had no commercial success until the advent of the modern radio receiving set which requires for its operation the conversion of the alternating current of an ordinary electric light circuit into direct current. In this conversion the condenser performs an important although secondary part. As happily put by Judge Byers in his consideration of the two patents in suit, it removes the hum which is "incompatible with the kinds of noise which it is the purpose of the radio to reproduce." For this use the devices manufactured under the two patents in suit have been commercially successful, as they are compact, taking up little of the limited space in the radio set, and withstand relatively high temperatures, which gives them a long life of efficient operation.

A condenser is among the oldest of electrical devices. In the familiar form of the Leyden jar, it was used by Benjamin Franklin in his famous experiment with the kite.

As might be expected from its early origin, a condenser is a simple device. It consists essentially of two conductors with an intervening nonconductor. Two sheets of metal, separated by a sheet of glass, when connected to a source of current, make a condenser. The conductor which first receives the current condenses or accumulates the electricity. The two conductors are known as electrodes, and the nonconductor between them as the dielectric. To distinguish the two electrodes, the one which first receives the current and is positively charged is called the anode, and the second electrode, negatively charged, through which the current leaves the device, is called the cathode. The efficiency of the condenser varies inversely with the thickness of the dielectric. In the illustration of the sheets of metal and the pane of glass, if the glass is made twice as thick, the capacity of the condenser is half as great. The film on the electrode, which serves as a dielectric in the condensers in suit, is so thin as to be incapable of measurement except by very delicate instruments. Consequently it is exceedingly efficient in giving capacity to the condenser.

Electrolytic condensers are a development from the early forms, but are also old in the art. In the type involved here, the anode is of aluminum, the film on the anode is the dielectric, and the cathode is of unfilmed metal. Both electrodes are immersed in a chemical solution, called the electrolyte, which conveys current from the anode and is in effect a part of the cathode.

### The First Patent in Suit.

In the first patent, only claim 5 is in issue. This is as follows:

"5. An electrolytic condenser comprising a containing vessel; aluminum electrodes therein, coated with heat-resistant electrolytic films; and an original electrolyte in the vessel, containing borax and a free acid."

This claim is to be read in connection with the following excerpt from the specification:

"I have discovered that while electrodes having the heat-resistant films described above can be advantageously used in any electrolyte, in an electrolytic condenser, rectifier, lightning arrester or other apparatus, they do not evidence to the fullest extent their remarkable property of withstanding high temperature unless they are used (1) in the identical solution, originally acidulated or unacidulated, in which the films were formed or subjected to the heat-treatment; or (2) in some other, but acidulated, electrolyte. That is, if the films are not used in the identical electrolyte of their formation or heat-treatment, then whatever electrolyte they are used in must be acidulated. It is this discovery that forms the subject of the present application for Letters Patent. In the appended claims I have used the term 'an original electrolyte' to mean the first electrolyte or its equivalent, an acidulated electrolyte."

It will be seen from this excerpt that the only discovery which the patentee claims is in the use of heat-resistant films in a specified electrolyte. The heat-resistant films to which he refers, as explained earlier in his specification, are the films which aluminum acquires under electrochemical treatment. Aluminum has the remarkable property, when immersed in a suitable electrolyte and subjected to an electric current, of acquiring a film which acts as a dielectric, so that the aluminum member of the condenser serves both as anode and dielectric. This property of aluminum has long been known in the art. In a paper read before the American Electrochemical Society at Philadelphia in 1902, put in evidence by the plaintiffs, it is said that this phenomenon was discovered in 1855. Mershon's first patent in suit points out that it is well-known that "the action of electrolytic condensers, rectifiers, and similar devices, depends upon the film which may be formed upon the surface of the aluminum, tantalum, magnesium, and other metals, when immersed in certain electrolytes and subjected to the electric current."

The novelty which Mershon claims for his film is that it is heat-resistant when formed as he directs and used in the electrolyte which he specifies. The term seems to have been new with Mershon, but the thing itself has been disclosed in the prior art. Hayden, in his patent No. 996,583, of June 27, 1911, showed that the film was heat-resistant in an alkaline electrolyte slightly acidulated by the addition of glycerin. What he says is not that the film is heat-resistant, but that the electrolyte permits the operation of the cell at high volt-

ages with but moderate temperature rise, which means the same thing. His electrolyte is boric acid, mixed with an excess of ammonia to make it alkaline, and then acidulated with glycerin. Zimmerman, in his patent No. 1,074,231 of September 30, 1913, showed that the "cell," by which it is plain from the context he meant the film, has high heat capacity when the electrolyte is composed of borax and boric acid.

Heat resistance and the process of obtaining it in the formation of the film had also been disclosed in an article by Günther Schulze on "The Behavior of Aluminum Anodes," published in 1906 by the Annalen der Physik, Series IV, vol. 21, page 929, in which the author sets forth the results of an elaborate investigation of the effect of temperature upon aluminum films. In this he states that "the cell is, therefore, especially sensitive to increase in temperature, and already loses its potential at temperatures at which it could still very readily have potential if it had only been formed at these temperatures initially." This is a plain disclosure of the fact that a film formed at a high temperature will be heat-resistant. At the time this paper was written, Dr. Schulze was director of the Physikalisch-Technische-Reichsantalt, which according to the testimony is the German institution corresponding to our Bureau of Standards. The defendant's expert Kleinschmidt testified that the periodical in which the article appeared is the best international magazine on physics, and that it is available in practically all college libraries.

On February 20, 1911, Mershon obtained in France a patent No. 423,598, for the process of making dielectric films in the manner pointed out in Schulze's article, by forming them at a high temperature, and later, on December 26, 1911, he obtained a like patent, No. 1,012,889, in the United States. The application for the French patent was filed February 20, 1911, more than two years before the application for his first patent in suit, so there is no question under the law of its status as a disclosure. These two patents show the process of making a film effectively heat-resistant. In the specification of both patents, which are in most respects exactly alike, he says, "Briefly stated, the invention consists in forming or preparing the films at a temperature above that at which they are afterward to operate," and also that the film formed according to the process "will be efficiently operative in a condenser, rectifier, or other-apparatus, at any temperature up to the limit before mentioned." It suggests the use of a borax electrolyte, acidulated with boric acid or phosphoric acid, and also that "the performance of the condenser electrodes so filmed will be somewhat better if they are operated in the identical electrolyte or in any acidulated electrolyte."

The electrolyte is the last element of claim 5. This must be considered in connection with the disclaimer which the patentee recorded in the patent office on November 23, 1929. That disclaimer, omitting the preliminary phraseology, was as follows: "Your petitioner has reason to believe that through inadvertence, accident, or mistake, without any fraudulent or deceptive intention, he has claimed more than that of which he was the original or first inventor. Your petitioner therefore disclaims from the scope of said letters patent any acidulated electrolyte which is not acidulated with an inorganic acid, such as boric or phosphoric acid." By "original electrolyte," Mershon has explained, as appears from the quotation from his specification, that he meant the identical solution in which the films were formed. There was nothing new in this. Most of the patents of the prior art relating to the formation of the film contemplate the use of the electrolyte in which the film was formed. Weinberg, who did not wish the film-forming electrolyte so used, plainly says so. He states in his claims that there is to be a preliminary immersion of the electrode in a filming solution which is independent of the electrolyte in which the electrode is to be used.

The question as to the electrolyte is thus narrowed to the question whether there is patentability in the use, in the combination claimed as limited by the disclaimer, of an electrolyte composed of borax and an inorganic acid, such as boric or phosphoric acid. In the light of the prior art, I cannot find that there was. The earlier patents to Mershon in my opinion are decisive of this question. Moreover, the patents to other workers in the art lead to the same conclusion.

The two patents to Bottome, No. 445,-687 of February 3, 1891, and No. 458,652 of September 1, 1891, for improvements respectively in asymmetrical electrical resistances and in electro-chemical transformers, show an electrode of aluminum

and an electrolyte consisting largely or entirely of sulphuric acid or a sulphate. This is an electrolyte composed of an inorganic acid.

The two patents to Pollak, the British patent No. 18,956 of 1898 for improvements in electrolytical condensers and electric current directing devices, and the United States patent No. 672,913 of April 30, 1901, for improvements in electrolytic current rectifiers and condensers, show in the former a filmed aluminum electrode in an alkaline electrolyte of phosphoric acids, either of neutral or of acid reaction, and in the latter a filmed aluminum electrode in an electrolyte composed either of organic or inorganic acids, or of their alkaline salts. In the British patent he recommends acid or neutral alkalines of phosphoric acids or in the alternative alkalines of organic acids.

The patent to Nodon, No. 669,802 of March 12, 1901, for improvements in devices for converting alternating electric currents into continuous ones, shows an electrode composed of an alloy of zinc and aluminum and an electrolyte of phosphoric acid to which ammonia may or may not be added.

The French patent to Renault, No. 334,495 of August 7, 1903, for an electrolytic rectifier for mono- or poly-phase alternating currents, shows an electrode of aluminum or of aluminum and copper and an electrolyte composed of borates, arsenates, or carbonates of ammonia, or borates, arsenates, or carbonates of sodium or potassium.

The patent to Büttner, No. 809,770 of January 9, 1906, for an improved asymmetric cell, shows aluminum electrodes in an electrolyte of caustic ammonia and boric acid.

The patent to Hickley, No. 861,282 of July 30, 1907, for improvements in electrolytic alternating-current rectifiers, shows aluminum electrodes and an electrolyte of phosphate of ammonia "or other well-known solutions for the purpose."

The British patent to the British Thomson-Houston Company, Limited, No. 1345 of 1909, for improvements in aluminum electrolytic cells, shows an aluminum electrode and an electrolyte composed of an acid solution of ammonium tartrate, to which glycerin may be added.

The patent to Weinberg, No. 979,906, of December 27, 1910, for improvements in electrolytic cells, shows a filmed aluminum electrode and an electrolyte of sodium phosphate, or ammonia, or of some other phosphate.

The patent to Hayden, No. 996,583 of June 27, 1911, for improvements in electrolytes for electrolytic cells, shows a filmed aluminum electrode and electrolyte composed of ammonium octoborate, prepared by adding to a 10 per cent. solution of boric acid an excess of ammonia, with a further addition of glycerin or milk sugar. The defendant's expert testified that the reaction of this electrolyte would be acid.

The patent to Peck, No. 1,008,860 of November 14, 1911, for improvements in electrolytes for aluminum cells, shows a filmed electrode and an electrolyte composed of boric or tartaric acid neutralized with an alkali. To this he adds glycerin to make the solution acid.

The patent to Zimmerman, No. 1,074,231 of September 30, 1913, on an application filed March 31, 1906, for improvements in electrolytic condensers, shows a filmed aluminum electrode and an electrolyte of ortho, meta, or pyroboric acids and their respective alkali and ammonium salts, "for example, borax, sodium, pyro-borate, $Na_2B_4O_7$, either alone or in combination." He recommends the addition of glycerin as advantageous. He thus discloses quite definitely an electrolyte of borax acidulated with an organic acid.

Mershon, therefore, was experimenting in a field in which the guide posts were plainly marked by earlier explorers. In the two patents to Bottome, he could find an electrolyte composed either of an inorganic acid or a neutral salt. In the British patent to Pollak, he could find, among other suggestions, an alkaline electrolyte acidulated with phosphoric acid; in Nodon, there is disclosed an electrolyte of phosphoric acid; in the United States patent to Pollak, an electrolyte of organic or inorganic acids, or of alkaline salts of organic acids; in Renault, a suggestion of the borates; in Büttner, an alkali combined with boric acid; in Hickley, a phosphate; in Weinberg, a phosphate; in Hayden and in Peek, a borate with a weak acid; in Zimmerman, three forms of boric acid and borax, and the suggestion of the addition of glycerin as a weak acid. Besides the patents, in the literature of the art there was the paper by Schulze already referred to, which showed the results of tests to determine the resistance of the aluminum film in various

electrolytes, and which pointed to the unmistakable superiority of the borates.

In the light of all this, I find that it was not a patentable discovery to combine a heat-resistant film with an electrolyte composed of borax and a free inorganic acid, such as boric or phosphoric acid. The principle applicable here has been expressed in two recent opinions of the Circuit Court of Appeals for the Second Circuit. In Fink v. V. Foscato, Inc., 79 F.(2d) 842, 843, Judge Swan, speaking for the court, said: "While an invention should not be invalidated merely because it comes after experimentation, still the experiment which succeeds must require some ingenuity, if it is worthy of being granted a patent monopoly. * * * Merely to run down every obvious alley until the best route to the desired goal is found cannot be deemed invention," citing Hollister v. Benedict & B. Mfg. Co., 113 U.S. 59, 73, 5 S.Ct. 717, 28 L. Ed. 901, Concrete Appliances Co. v. Gomery, 269 U.S. 177, 185, 46 S.Ct. 42, 70 L. Ed. 222, and Kalamazoo Loose Leaf Binder Co. v. Wilson Jones L. L. Co. (D.C.) 286 F. 715, 718. The same court in Ruben Condenser Company v. Aerovox Corporation, 77 F.(2d) 266, 267, speaking by Judge Learned Hand, said: "In the light of all this it seems to us that the patent does not rest upon an authentic invention, but upon one of those steps in an art which demand only patient experiment. Especially in chemistry it is possible to proceed by a system of trial and error, varying formulas by permutation and combination, and recording the results of each. * * * Ordinarily invention demands more than that; some resumption of a line of experiment from which the art had looked away, * * * some departure which required originality or independence of conception; something more than routine testing of obvious combinations."

■ As heretofore indicated, Mershon's prior patents dispose of the question of novelty, both of the heat-resistant film and of the electrolyte. Both are disclosed in his French patent No. 425,598 issued on February 20, 1911, on an application filed December 12, 1910, and in the United States patent, No. 1,012,889 issued December 26, 1911, on an application filed January 5, 1910. In these two patents he sets forth the process of forming the films at a temperature higher than that to which they would be subjected in use; and for the composition of the electrolyte in which they are to be formed he suggests a solution of borax, acidulated with boric or phosphoric acid. He also points out that the performance of the filmed electrodes in electrical apparatus will be better if used in the identical electrolyte in which they were formed or in any acidulated electrolyte. He cannot through a later patent gain a monopoly of the use of a filmed electrode in the electrolyte so discovered. It is true, as the plaintiffs urge, that these two prior patents are for a process, not for a condenser, but the question is not as to the scope of their claims, but as to what their specifications disclose. See Minerals Separation North American Corporation v. Magma Copper Company, 280 U.S. 400, 402, 50 S.Ct. 185, 186, 74 L.Ed. 511, where Mr. Justice Holmes said: "The question is not what is the precise scope of the claims * * * but what is disclosed in the specification and made known to the world," citing Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L. Ed. 651.

### The Second Patent in Suit.

■ As to the second patent in suit, the claims in issue are as follows:

"5. An electrolytic condenser having an electrolyte, an anode of filming metal immersed therein, a source of unidirectional current having its positive pole connected with said anode, and a copper cathode in contact with the electrolyte and connected with the negative pole of the said source of current.

"8. In an electrolytic condenser, a copper containing vessel or tank, an electrolyte therein, an anode of filming metal immersed in the electrolyte, and a source of unidirectional current having its positive pole connected with said anode and its negative pole connected with the copper tank.

"10. An electrolytic condenser comprising a copper tank, an electrolyte therein, and an anode of filming metal immersed in the electrolyte.

"12. An electrolytic condenser having an electrolyte and susceptible of being harmfully affected by the presence of lead in the electrolyte, an anode of filming metal in the electrolyte, and a condenser member of copper in contact with the electrolyte.

"13. The combination of a circuit having alternating and unidirectional components of voltage and current, and an electrolytic condenser having electrodes connected with said circuit, at least one of the

electrodes being of copper and constituting a cathode, connected with the negative side of said circuit, and at least one of said electrodes being of filmed metal and connected with the positive side of said circuit.

"14. The combination of a circuit having alternating and unidirectional components of voltage and current, and an electrolytic condenser having an electrolyte and having electrodes connected with said circuit, at least one of said electrodes being a vessel of copper, containing the electrolyte and serving as a cathode, connected with the negative side of said circuit, and at least one of said electrodes being of filmed metal and connected with the positive side of said circuit.

"15. An electrolytic condenser having an electrolyte, a filmed anode, a copper member surrounding the anode, and an exciting circuit having its positive side connected with the anode and its negative side connected with the copper member.

"16. The combination of a circuit having alternating and unidirectional components of voltage and current, and an electrolytic condenser having an electrolyte and a filmed anode therein connected with the positive side of said circuit, and a copper member surrounding the anode and connected with the negative side of said circuit."

All the elements of these claims are old, and it is unnecessary to discuss the claims separately. Plaintiff's counsel in their brief say that the second patent is presented in connection with the first, as an improvement upon it, and that it relates to the discovery that copper, unlike other common metals, has no harmful effect either upon the film or upon the electrolyte. The gist of the discovery was that copper could be used for the container of the condenser and that, by connecting the container to the negative side of the circuit, it would serve as the cathode element.

The plaintiff's expert Waterman testified that the novelty of the second patent in suit was the copper can. No inventive thought was involved in this; not even patient research was needed. Among the relatively few metals commercially available, it required little experiment to determine that copper was not attacked by the electrolyte, and none to determine that it was a good conductor. The prior art had shown the use of the container as a cathode (Bottome, No. 445,687 of February 3, 1891), and also the use of copper for one of the electrodes in a rectifier (Pollak, No. 672,913 of April 30, 1901).

The substitution of one well-known metal for some other well-known metal is not invention. As said by the Supreme Court: "A patent cannot be taken out for an article old in purpose and shape and mode of use, when made for the first time out of an existing material, and with accompaniments before applied to such an article, merely because the idea has occurred that it would be a good thing to make the article out of that particular old material." Gardner v. Herz, 118 U.S. 180, 192, 6 S.Ct. 1027, 1034, 30 L.Ed. 158. Mershon did more than this, but not enough more. What he did required no more than the skill of his calling as an electrical engineer. Electric Cable Joint Company v. Brooklyn Edison Company, Inc., 292 U.S. 69, 80, 54 S.Ct. 586, 78 L.Ed. 1131, and cases there cited.

I conclude that claim 5 of the first patent in suit, and claims 5, 8, 10, 12, 13, 14, 15, and 16 of the second patent in suit are invalid.

Bill dismissed with costs.