## VICTORY FIREWORKS & SPECIALTY CO. et al. v. COMMERCIAL NOVELTY CO.

### No. 2449.

District Court, D. Maryland.
Nov. 20, 1936.

William Pepper Constable, of Baltimore, Md., Nathan Heard, Frederick A. Tennant, and Heard, Smith & Tennant, all of Boston, Mass., for plaintiffs.

William H. Hudgins, of Baltimore, Md., Joshua R. H. Potts and Basel H. Brune, both of Philadelphia, Pa., and Eugene V. Clarke, of Chicago, Ill., for defendant.

CHESNUT, District Judge.

This is the usual type of equity suit in which the plaintiffs ask an injunction and accounting for alleged infringement of patent rights. The patent involved is United States Patent No. 1467755, issued September 11, 1923, to Alberto Cimorosi, one of the plaintiffs, on his application filed December 30, 1920. It is for an improvement in toy torpedoes. The other plaintiff in the case, the Victory Fireworks and Specialty Company, is a Maryland corporation with plant at Elkton, Maryland, which, by virtue of successive assignments has become the sole licensee of the patent. The defendant is also a Maryland corporation manufacturing toy torpedoes with plant situated at Havre de Grace, Maryland, about twenty miles distant from the plaintiff's plant. Both plaintiff and defendant manufacture and sell toy torpedoes of substantially similar construction, but the defendant denies liability for infringement on the ground that the claims of the patent in suit when limited by proper construction do not cover toy torpedoes as made by either the plaintiff or the defendant; or if the patent is construed broadly enough to cover the articles it is invalid by virtue of anticipation.

The principal facts developed in the testimony may be briefly stated. The use of toy torpedoes is not new. But prior to the issuance of the plaintiff's patent they were of materially different construction. The types then in use were known as "Japanese" torpedoes and "tubular" torpedoes. The former consisted of small gravel and an explosive substance enclosed in a small paper bag closed by twisting the upper ends. They were exploded by throwing on the hard surface of a sidewalk or roadway. The tubular torpedo was cylindrical or tubular in shape consisting of stiff paper or cardboard as the container for the gravel and explosive and suitably closed at both ends. It was also exploded by throwing against a hard object. The explosion and consequent noise is caused by the friction of the gravel upon the explosive chemical as a result of percussion. A somewhat similar article having the same general purpose was also in common use but the explosion thereof was caused in a different way. This latter article, sometimes called "crazy crackers" or "son

of a gun" or "devil on the sidewalk" consists of a comparatively flat and thin paper package containing chemicals which was exploded by stamping or grinding with the heel of the shoe on the roadway after it had been thrown down, thus making a succession of crackling noises. All these articles are a type of minor fireworks and are generally used throughout the country on or about the Fourth of July and in some parts of the country, particularly in the South, about Christmas time. Their supposed utility, not challenged by the defendant (see Western Elec. Mfg. Company v. Larue, 139 U.S. 601, 608, 11 S.Ct. 670, 35 L.Ed. 294), is to make a noise. It is said they are also used for this purpose at some conventions and other gatherings of societies of large numbers where noise is thought to be a desirable incident of the occasion.

The Japanese and tubular torpedoes were relatively defective in that their construction made the explosive substance subject to deterioration by absorption of moisture, and they were liable to be accidently exploded in transportation, and did not always explode upon percussion. The improvements in toy torpedoes contemplated by Cimorosi were intended to overcome these defects as well as to achieve mass production at minimum cost. His objective was to produce a toy torpedo which would be safe in transportation, protected from the deteriorating influence of moisture and other conditions of the atmosphere, and insure instantaneous explosion upon intentional percussion. His idea was to accomplish these objectives by agglomerating a mass of granular material upon a small paper cartridge containing the fulminating composition. More particularly he conceived the thought that the ideal toy torpedo could be made by inserting gravel and the explosive chemical in a small paper container somewhat like a capsule, and then rolling it in a mass of granular particles of fibrous material, as for instance sawdust, to which would be added some sticky and agglutinating substance such as glue or liquid silicate of soda, so that the particles of sawdust would adhere to each other and to the capsule, in a more or less globular form. His thought was that the result could be accomplished by either first applying the agglutinating substance to the paper cartridge and then rolling it in the dry sawdust, or by first applying the agglutinate to the dry sawdust and rolling the dry paper cartridge therein, or by adding sawdust and glue in proper proportions as the process progressed. It is obvious that the process contemplated was to use the cartridge as the nucleus or core of the globe or ball finally created by the accumulation of the agglutinated sawdust in attachment to the cartridge. It is important to note that in the process particles of sawdust were both *agglutinated together* and also to the surface of the cartridge. The process was somewhat like the creation of a snowball by rolling it down hill, but more exactly the final structure in the formation of the outer shell resembles the familiar pop corn ball, although the granular particles are more closely compacted. The shell so formed is comparatively rigid or non-resilient, but is nevertheless somewhat elastic. In other words, the sawdust shell enclosing the cartridge results from a process of agglomeration by agglutination. Toy torpedoes in spheroidal or globular form were themselves not new in the art but the process of their formation by the enclosing sawdust shell produced by *agglutination and agglomeration* was itself new. And it is this feature of construction which was made the basis of the patent as issued by the Patent Office. The gist of the patent lies in the outer shell and not in the inner capsule.

In the application for his patent Cimorosi specified that the encasing shell could be formed either by first applying the agglutinate to the paper cartridge and then rolling it in dry sawdust, or by inserting the dry cartridge in sawdust mixed with an agglutinate. He expressed preference for the latter method, but experience in mass production showed that a combination of the two alternative methods was most satisfactory. In consequence the enclosing shell of the plaintiff's manufacture is accomplished by first dipping the paper cartridge in an agglutinating solution, then placing it in an open half barrel or tumbler containing dry sawdust which is rotated on the axis of its long diameter to effect the tumbling or rolling of the paper cartridge in the sawdust, whereby a certain amount of the sawdust adheres to the sticky surface of the cartridge, and then from time to time additional quantities of the agglutinate are sprayed into the mass and additional dry sawdust is added during the rotating or tumbling process. Success in the manufacture is dependent upon the proper proportions of the mixture of sawdust and agglutinate which is thus ap-

plied to the paper cartridge and becomes the shell of the torpedo. As a result of the process the torpedoes assume approximately globular or spheroidal form and constitute in appearance small balls about three-quarters of an inch in diameter. Their appearance is rendered more attractive to the eye by mixing small pieces of vari-colored paper (confetti) with the mixture which forms a superficial covering for the sawdust shell. When dried the small granular particles of the sawdust, closely agglomerated and agglutinated, form a tight enclosing shell which is almost of the hardness and density of a fibrous wood and result in what Cimorosi described as a substantially non-resilient shell which is nevertheless "sufficiently tenacious to produce a pressure over a sufficient area of the fulminating material to cause substantially instantaneous explosion thereof." Or more shortly stated, the torpedo when thrown against an unyielding surface will by virtue of its shape and composition more surely explode with a louder noise, which is the ultimate objective to be accomplished, and constitutes the only utility of the article.

This new method of construction of toy torpedoes by Cimorosi proved successful and the plaintiff corporation's predecessor as the original licensee by Cimorosi, manufactured and sold it in very large quantities. Shortly, by reason of its commercial success, it eliminated the prior form of Japanese torpedo entirely from the market, and largely superseded the use of the tubular torpedo which was particularly unsatisfactory by reason of its frequent failure to explode when falling in a particular manner, to which defect the globular torpedo was not subject by reason of its spheroidal form. 95% of the toy torpedoes now sold are of the globular variety. In the period from September 1, 1923, to July, 1936, the plaintiff corporation and its predecessors made and sold 2,782,955 gross of these globular torpedoes at a total sale price of $1,586,835.14. In the years 1924 to 26, both inclusive, the sales in dollars by the plaintiff corporation's predecessor approximated $450,000 and for the years 1927 to 30, both inclusive, the average annual dollar sales amounted to over $150,000. Since then, owing to economic conditions and probably partially to competition from the defendant, sales substantially declined and averaged about $60,000 per year for the years 1932 to 35, both inclusive. The licensee

has paid substantial sums as royalty to the patentee at the rate of $100 a week for a period of several years past.

The testimony leaves no doubt that the defendant's predecessor substantially copied the plaintiff's article and process of manufacture thereof shortly after the globular torpedoes became a signal commercial success. Archie Fabrizzio married a niece of Cimorosi and for some years was employed by the plaintiff's predecessor in its Elkton plant (1923–25) in the practical manufacture of globular torpedoes, and claims that it was due to his skill that the process of mass production was made commercially successful. After the globular torpedo had established success Fabrizzio severed his association with Cimorosi and the plaintiff's predecessor at Elkton and became the manager of a new plant established at Lancaster, Pennsylvania, by the defendant's predecessor corporation which in 1927 entered upon the manufacture and sale of globular torpedoes in a substantial amount. A few years ago the Lancaster plant was moved to Havre de Grace, Maryland, and in 1932 its assets were acquired and business continued by a new Maryland corporation which is a wholly owned subsidiary of the Paine Fireworks Company with national distribution, while plaintiff corporation is a subsidiary of the National Fireworks Company with like wide distribution. The average annual sales of these globular torpedoes by the defendant corporation is about $45,000 in amount.

The patent contains seven claims, of which the first four are for the article and five, six and seven cover the process of manufacture. Claims three and five are respectively typical. They read as follows:

"3. A torpedo comprising a substantially cylindrical cartridge completely filled with a fulminating composition having a spheroidal shell formed of a mixture of an agglutinant and a comminuted fibrous material.

"5. The process of making torpedoes which consists in filling a cartridge with a fulminating composition and agglomerating thereon a shell of agglutinated granular material upon said cartridge by means of a suitable adhesive."

It is the defendant's contention that the patent claims, if valid against anticipation, must be very narrowly construed and limited to a process and an article manufactured from a process whereby the paper

cartridge, *without a* bath of the agglutinate, is placed in a *wet* mixture of sawdust and agglutinate. Or, in other words, the patent claims must be limited to the condition that a *dry* cartridge is rolled in *wet* sawdust. And it is further said that if the patent is broad enough to cover the process of manufacture in which the paper cartridge is first given a bath in the agglutinate, and then introduced into dry sawdust, the patent is invalid by reason of anticipation, with particular reference to the Graber Patent (Defendant's Exhibit No. 6) issued November 3, 1908, United States Patent No. 902,650. This patent was not for a toy torpedo but for the kind of pyrotechnic or fire-works device previously referred to as "crazy crackers," consisting of a relatively flat, thin and circular package somewhat in the form of a wafer, and containing an explosive substance enclosed in a harder outer shell designed principally to be exploded by stamping or scraping on the sidewalk with the heel of the shoe.

Claim 2 of this Graber patent reads as follows:

"The herein described pyrotechnic device comprising a suitable pyrotechnic composition capable of being exploded by percussion and inclosed within a safety-coating comprising a wrapper of tissue paper having its outer surface gummed, and a layer of wood-pulp adhering to said gummed surface, substantially as and for the purposes set forth."

The process of manufacture described by Graber was to place the fulminating composition on tissue paper which is folded and becomes a flat container, and then is dipped in liquid glue and "finally coated with a protecting material, such as wood-pulp, or a material of a similar nature, the same being sifted upon or otherwise applied to the stiff gummy or sticky surface 3, so as to adhere to the same and thereby produce the shell or coating 4 previously mentioned, which as soon as the finished product has finally dried forms a suitable safety covering against the accidental ignition of the pyrotechnic compound by friction caused by the rubbing together of two or more of the finished articles." Graber's purpose is disclosed by the concluding paragraph of his specifications in which he says:

"From the foregoing description of my present invention it will be clearly evident that I have produced a pyrotechnic device which is perfectly safe from premature or accidental ignition."

It is apparent that Graber's shell enclosing the explosive substance was designed merely as a safety device against accidental ignition. And it does not contain the distinctive feature of Cimorosi's patent in the combination of agglutination and agglomeration resulting from a tumbling or rolling of the capsule containing the explosive in a mass of sawdust treated with an agglutinant. Furthermore the hardened protective shell of wood-pulp or similar substance is formed merely by sifting or being otherwise applied to the sticky surface of the flat paper container. It is true that Graber invented a combination of wood-pulp or similar material, such as sawdust, to adhere to a sticky paper wrapping to form a protective covering, but its process of application and resultant characteristics are quite different from Cimorosi's process. In the latter the shell is incidentally a safety device against accidental ignition; but much more importantly it is created in spheroidal form to insure certainty of explosion upon intentional percussion, to prevent deterioration from absorption of moisture by the explosive and to cause greater noise by the comparative non-resiliency of the enclosing shell, somewhat resisting but not preventing final fracture upon explosion.

The exact contention of the defendant based on the Graber patent is that it anticipated Cimorosi in the process of applying wood-pulp or sawdust to a sticky surface for the purpose of forming an enclosing shell; and therefore Cimorosi's patent is novel only when limited to the insertion of a dry or non-sticky article into a sticky mass of sawdust. And it is argued that as the Patent Examiner cited the Graber patent at one stage of the progress of the Cimorosi patent through the Patent Office with a resultant modification in the phraseology of the claims (suggested indeed by the Patent Examiner), it must be held that it was the intention in allowing the Cimorosi patent claims to limit them to a process where the dry cartridge is inserted in a wet *mixture* and not to extend them to the insertion of a sticky wet cartridge in dry sawdust which, it is said, was anticipated by Graber. This view, however, does not seem tenable. It unduly narrows the scope of the word "mixture" inserted in some of the patent claims after the citation of the Graber patent, and

the word does not appear in Claims 4 and 5 of the patent.

It is perfectly evident from Cimorosi's specifications that he intended his process to be applicable to both alternative methods of application of the shell to the cartridge. Thus on page 2, line 46, he says:

"The shell may be constructed and applied by covering the cartridge with a coating of viscous adhesive 'material 9, such as glue or other adhesive and applying the granular material thereto. Preferably, however, the filled cartridge, either in the coated or uncoated state, is dropped into a mixture of granular material and adhesive of such consistency that it will accumulate upon the cartridge when the latter is rolled in it so that the agglomerated granular material will accumulate upon the cartridge in a spheroidal or substantially spherical form."

He continues in line 71:

"The agglutinated granular material first adhering to the cartridge will provide a thin layer, somewhat increasing the diameter of the article and causes the same to begin to assume a spherical form 13 as illustrated in Fig. 3, and further rolling of the cartridge will eventually accumulate a sufficient amount of the agglutinated granular material to produce an article 15 of spheroidal or substantially spherical form."

And again in line 108:

"In the practical performance of the process the cartridges may be dropped into a pan of sawdust and a sufficient amount of glue applied to the cartridge and to the sawdust to cause the cartridge when rolled about in the sawdust, by oscillating the pan, to form a spherical, or spheroidal shell upon the cartridge."

"It will be understood that the embodiment of the invention disclosed herein is illustrative and not restrictive and that the torpedo may be made in any desirable form and that the agglomerated mass forming the shell thereof may be produced in any suitable manner."

It is clear, therefore, that it was Cimorosi's intention as expressed in the specifications to cover both possible methods of application of the shell to the cartridge, and it seems not reasonable to infer that the claims when allowed were intended to be restricted to the one method of application rather than the other. An examination of the file wrapper of the Cimorosi patent does not disclose any requirement or even suggestion from the Examiner for modification of the inventor's intention as expressed in his specifications; nor does it show that any distinction was made by the Examiner from the standpoint of patentability with respect to the alternative methods. And indeed if the Graber patent is an anticipation as to one method of application of the sawdust to the cartridge, it would seem reasonably clear that there would be no invention inherent in the alternative method.

It appears that the Examiner distinguished the Cimorosi application from the Graber patent in the requirement that the claim should call for a "mixture of an agglutinant and a granular material"; but there is nothing to indicate that the Examiner based this distinction on the particular method of obtaining the mixture, whether from·agglutinant added directly to the sawdust or added first to the cartridge and by it transferred to the sawdust with subsequent addition of more liquid glue to the original mixture. And it may be noted that Claim 4 as originally submitted was never objected to by the Patent Examiner. It reads, after correction of a clerical error, as follows:

"A torpedo comprising a cartridge having a central tubular member filled with a fulminating composition and provided with enclosing heads and an enclosing shell formed of granules of material agglutinated together and to said cartridge."

In the claim as so worded it is apparent that the distinctive characteristic of the encasing shell is that it is "formed of granules of material agglutinated together and to said cartridge." It would seem evident that the formation of the encasing shell requires the adhesion of a number of separate layers of the granules of sawdust one upon the other around the cartridge. And if the only agglutinate present was the film of glue resulting from the original bath of the cartridge in the glue, the first layer of sawdust would adhere to the cartridge, but when it was once completely covered there would be no adhesive present, to make subsequent layers of sawdust attach themselves to the first layer, unless some agglutinant was added to the mass of sawdust. It is said for the defendant it does not add the agglutinant to the sawdust at any time, but accomplishes the same result by repeated immersions of the cartridge in the liquid agglutinant so that more and more sawdust will

accumulate in the formation of the shell. Thus the defendant says that his method of forming the shell must be held outside of the patent claims when limited by proper construction by reason of the Graber patent. I conclude, however, that we are not warranted in so limiting the coverage of the Cimorosi claims and for the reasons already given, I am of the opinion that even with the broader construction it is not anticipated by the Graber patent.

■ Defendant also contends unless the Cimorosi claims are so limited by construction the state of the art is such that they include no patentable novelty. I have examined the prior patents (Defendant's Exhibits D1 to 10 inclusive) which are submitted to show the prior art, but nevertheless I still find novelty in Cimorosi's invention. It is true that most of the features of his improvement in toy torpedoes, in one form or another, have heretofore been known and used separately. Thus there is nothing new in the form or contents of the inner cartridge; nor in an encasing device to protect it; nor in the spheroidal form of the latter; nor in the use of a fibrous material such as woodpulp or sawdust for a casing; nor in the mere process of rolling or tumbling to increase size or bulk. Cimorosi has, however, combined several prior ideas or devices to create a new and, for the limited purpose mentioned, useful result in the making of much more efficient toy torpedoes. See Parks v. Booth, 102 U.S. 96, 102, 26 L.Ed. 54; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 40 F.(2d) 910 (C.C.A.4); Langston Co. v. F. X. Hooper Co. 8 F.Supp. 613, 616 (D.C. Md.), affirmed (C.C.A.) 79 F.(2d) 992. It was something more than the "exercise of the skill of the calling or an advance plainly indicated by the prior art." Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 486, 55 S.Ct. 455, 458, 79 L.Ed. 1005; Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 443, 31 S.Ct. 444, 55 L.Ed. 527; Electric Cable Joint Co. v. Brooklyn Edison Co., 292 U.S. 69, 79, 54 S.Ct. 586, 78 L. Ed. 1131. Furthermore there is a really new feature in the Cimorosi process which consists in the combined agglutination and agglomeration of the granules of sawdust formed by the process of tumbling whereby they are both agglutinated to the cartridge and to each other to form the casing in spheroidal form. And this combination of the new and old creates a new utility for this class of articles in the combined advantages of (1) safety against accidental ignition in transportation or handling; (2) protection from deterioration by absorption of moisture; (3) certainty of detonation upon intentional percussion due to the spheroidal form which insures explosion no matter what the point of contact between the torpedo and the resisting object; and (4) intensity of explosion due to the substantially non-resilient characteristic of the shell of agglomerated and agglutinated material which is "sufficiently tenacious to produce a pressure over a sufficient area of the fulminating material to give substantially instantaneous explosion" and therefore a louder noise.

■■ It is true, of course, that the invention itself is neither great nor important, and the comparative triviality of the subject may from some points of view be thought sufficient to raise some doubt as to the validity of the patent. But against this we have first, the presumption of validity flowing from the grant of the patent by the Patent Office, which in this case is strengthened by the specific consideration of the Graber patent, the only one in the prior art seriously relied upon as an anticipation; and secondly, we have also the factor of very marked commercial success. These two considerations are sufficient to overcome any doubt as to the validity of the patent which might exist. Gulf Smokeless Coal Co. v. Sutton, Steele & Steele (C.C.A.) 35 F.(2d) 433, 437; Langston Co. v. F. X. Hooper Co., supra (D.C.) 8 F.Supp. 613, at page 617, and see Tumbler v. Baltimore Paint & Color Works, 11 F.Supp. 183, 188 (D.C.Md.), citing numerous cases on this point. It is clear enough that Cimorosi was the first inventor of a successful globular torpedo, and it is equally clear that the defendant's predecessor and the defendant have paid tribute to his successful advance in the very special art by substantial imitation which clearly constitutes infringement if the patent covers the subject matter, which I find it does.

■ A subordinate question in the case is whether the patent covers a kindred form of minor fireworks made by both parties and known as "Salutes." These are spherical articles constructed in practically the same way as the torpedoes but the detonation is caused by ignition of a fuse projecting from the ball-like object and connect-

ed with the interior explosive. They are designed to be exploded not by impact but by ignition of the fuse; and the explosive material imbedded in the outer casing (which is formed in practically the same way as that of the torpedo) is of a somewhat different chemical substance to facilitate explosion by ignition rather than by percussion. Shortly stated, the defendant's contention is that the Salutes are not covered by the claims of the patent in suit because they are Salutes and not torpedoes. Each of the claims distinctly comprehends "torpedoes" alone. It seems quite clear therefore on well known principles of construction of patent claims with regard to infringement that the Salutes are not covered by the patent unless "torpedoes" can fairly be understood as a term in the art which includes Salutes. I find nothing in the testimony which would justify the affirmative view as to this. Both are species of toy fireworks. Both may be called pyrotechnic devices, but they are different species of a general class. The testimony shows that Salutes are known and sold by that particular name by both parties and have never been called "torpedoes." Just as the torpedo differs from the device referred to as "Crazy Crackers," so Salutes differ from torpedoes. Torpedoes are more largely used than Salutes, it being estimated that the proportion of Salutes to torpedoes sold is from 12½% to 25% only.

And this view that the patent does not cover Salutes is strengthened by the consideration, as pointed out by defendant's counsel, that each claim of the patent includes a "fulminating composition", as an essential element of the claim, and that in his specifications (p. 2, line 30) Cimorosi used the phrase to denote a composition which would explode on *impact,* without reference to ignition.

The plaintiff contends that Salutes are covered by the patent because the essence of the latter consists in the outer shell and not in the fulminating composition in the inner cartridge, and if Salutes of the character now made by the defendant had been patented prior to Cimorosi they would have constituted an anticipation, on the well established doctrine that "that which infringes if later, anticipates if earlier." Miller v. Eagle Mfg. Co., 151 U.S. 186, 203, 14 S.Ct. 310, 317, 38 L.Ed. 121. But the answer is found in the equally established law that a patentee is limited to the claims as allowed. White v. Dunbar, 119 U.S. 47, 51, 52, 7 S.Ct. 72, 30 L.Ed. 303; McClain v. Ortmayer, 141 U.S. 419, 423–425, 12 S.Ct. 76, 35 L.Ed. 800; Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 487, 55 S.Ct. 455, 79 L.Ed. 1005; Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U.S. 399, 410, 25 S.Ct. 697, 49 L.Ed. 1100. Here it is too clear for argument that, by both the claims and specifications, the patentee was not claiming an improvement for pyrotechnic devices generally, but was intentionally limiting his improvement to a specific and particular species of minor fireworks, a torpedo; and therefore such cases as Western Electric Mfg. Co. v. Larue, 139 U.S. 601, 11 S.Ct. 670, 35 L.Ed. 294, and Braren v. Horner (Cust. & Pat. App.) 47 F.(2d) 358, 364, cited by the plaintiff, are not applicable. I conclude, therefore, that the defendant has not infringed the plaintiff's claims in the manufacture and sale of Salutes.

Plaintiffs are entitled to a permanent injunction in the usual form against the defendant with respect to the sale of toy torpedoes which constitute an infringement of the plaintiff's patent as herein construed. It appears, however, that in the last year or two the defendant has substantially and materially changed its style of manufacture of toy torpedoes and the plaintiffs are not claiming an infringement with respect to this altered style of manufacture.

Counsel may submit a decree in accordance herewith, taxable court costs to be paid by the defendant. If the parties desire more specific findings of fact and conclusions of law than are herein contained, counsel are requested to submit them promptly for consideration.