## CARSON v. INDIANA FIBRE PRODUCTS CO.

### No. 5341.

Circuit Court of Appeals, Seventh Circuit.
March 28, 1935.

Joseph A. Minturn and Herbert A. Minturn, both of Indianapolis, Ind., for appellant.

Ralph G. Lockwood and Lockwood, Goldsmith & Galt, all of Indianapolis, Ind., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BARNES, District Judge.

EVANS, Circuit Judge.

On October 15, 1929, upon application filed March 8, 1926, a patent was issued to George A. Bell and John H. Carson, which was duly assigned to appellee. It covered a "Fiber-Dish Machine." Claims 1, 2, 3, 4, 10, 11, and 12 of its 15 claims are involved in the present appeal. The District Court sustained the patent and held the claims in issue were infringed.

In the specifications of the patent, which were accompanied by elaborate and intricate drawings, the rather simple invention was described in detail, from which it appears that the patented machine was used in making paper pie plates, and the asserted patentable novelty resided in a combination of elements which made the cutting and stamping of the paper sheets automatic.

The applicants stated the general purpose of their invention in the following words:

"This invention pertains to a paper pie plate or dish making machine.

"The object of the invention is to provide a machine wherein the stock in the form of an endless paper sheet is automatically and periodically fed into the machine, from which the blanks are cut, after which they drop into position to be stamped by a suitable die for dishing them and then drop onto a conveyor belt which conveys the completed article from the machine.

"One feature of the invention resides in the automatic means for feeding the paper into the machine whereby it will be fed to the proper extent and then stopped sufficiently long for the shears to cut out the proper blanks.

"Another feature of the invention resides in the arrangement of the shears whereby they are staggered with relation to each other so as to eliminate any waste stock, and are provided with means for overcoming the usual vacuum and forcing the blank from the shears so it will readily drop into position to be stamped into shape.

"Another feature of the invention resides in the mechanism for operating the dies and the means for feeding the paper blanks thereto and discharging them therefrom onto a conveyor belt, the paper stock being properly heated by the dies so that they can readily conform to the shaping thereof."

Claims 1, 2, 10, and 12 are illustrative and are set forth in the margin.[1]

The appeal turns upon the familiar issue of fact. Was there invention?

What was contributed to the machinery for cutting and forming paper pie plates?

The specifications and drawings are more confusing than helpful. They seem to evidence a studied effort to make what is in fact quite a simple issue, an involved and confusing one. Like long, involved, and argumentative findings of fact, they detract, if anything, from the force and effect which would otherwise be given them.

The advance over the prior art is not outstanding nor is it difficult to understand. This statement reflects in no way upon the validity of the invention. Applied generally it bespeaks a favorable consideration of the inventor's idea, provided the court can see patentable novelty therein.

In making paper pie plates, the industry has for years used two machines: one, a paper cutting; the other, a paper forming machine. The cutting machines were old, and no specific type is designated in any of the claims. It was the usual practice to feed a paper sheet (by feeding rolls) to rollers which removed curls in the paper, after which the paper moved under a plurality of cutting dies in staggered relation. The cutting dies cut out circular disks which dropped to a point below. These circular disks were (under the old practice) removed by hand and fed to the forming machine which was located nearby. This forming machine had dies, which in number, size, etc., bore relation to the cutting dies. When the disks were fed to the forming machine, these dies turned the edges of the paper so that the desired and familiar type of pie plates with upturned edges resulted. Such machines, so used, were old, and no novelty is or can be asserted in their adoption and use.

Appellee, however, contends that it made use of means whereby the product of one machine was automatically conveyed to the other. In other words, the cutting machine was placed higher than the forming machine. The circular pieces of paper dropped into a trough which conveyed them to the forming machine where means were provided for supporting and withholding the circular blanks from their respective dies until the blanks being formed therein had been discharged. Some of the claims provided means for actuating the cutting and the forming dies in timed relation to each other.

Patents long antedating the one in suit were issued, which covered the use of troughs for conveying the product of one machine to another to attain automaticity of operation. Automaticity, as such, has been much sought in the production of low-priced articles, and means to accomplish this

---

[1] "1. A machine of the character described including means for feeding a paper strip into the machine, a plurality of blank cutting shears positioned in staggered relation to each other on said machine, a forming die associated with and spaced from each of said shears, means for guiding the blanks cut by each of said shears to its respective die, and means for actuating said shears and dies in timed relation to each other.

"2. A machine of the character described including means for feeding a paper strip into the machine, a plurality of shears mounted in said machine for cutting a plurality of blanks from the paper strip, a shaping and forming die mounted in said machine associated with and spaced from each of said shears, means for causing the blank cut by each shear to pass to its respective die, and means for operating said shears and dies in timed relation with each other. * * *

"10. A machine of the character described including means for feeding a paper strip into the machine, a plurality of cutting shears positioned in staggered relation to each other for cutting blanks from the sheet of material and permitting them to drop therefrom, a forming and shaping die mounted on said machine for each of said shears and positioned below the same for receiving the paper blanks dropped therefrom, guide members mounted on said machine for guiding the blanks from the shears to their respective dies, means associated with said dies for receiving and positioning the blanks preparatory to being pressed therein, and means for actuating said shears and dies in timed relation with each other. * * *

"12. A machine of the character described including a substantially vertical face plate, a plurality of shears mounted on said machine and associated with said face plate for cutting blanks from a paper strip fed therein, a forming and shaping die for each shear mounted below their respective shears in position to receive said blanks as they are dropped therefrom, means for guiding said blanks to their respective dies, and means for supporting said blanks and withholding them from their respective dies until the blank being formed therein has been discharged."

result in kindred arts were well known and widely adopted. Positioning parts of a machine so as to make use of gravity, utilization of troughs to convey an uncompleted product to another machine or another part of the same machine certainly did not evidence a high grade of mechanical skill in 1929. We cannot believe that either of the elements alleged to be new in the combination arose to the dignity of invention. Concrete Appliances Co. v. Gomery, 269 U. S. 177, 46 S. Ct. 42, 70 L. Ed. 222; Electric Cable Joint Co. v. Edison Co., 292 U. S. 69, 79, 54 S. Ct. 586, 78 L. Ed. 1131.

Each case must be determined on its own peculiar facts. We cannot and do not ignore the views of the District Court whose judgment we respect. The correct conclusion in any case, however, involves the application of a test not capable of accurate statement or definition to a completed combination, the effect of its use in the art being likewise not ascertainable with mathematical precision. Thus, each case presents the same question anew. Each calls for the determination of a mixed issue of fact and law, the solution of which likewise calls for the application of a test or standard, which itself is somewhat relative—at least not fixed and absolute. Under such circumstances we obviously should hesitate before striking down a patent which covers a machine which is practical and useful and carries some features not theretofore used in the particular art into which it is to become an effective factor.

It is rather natural and surely quite common for one who is so fortunately situated as to obtain a rear viewpoint of an art to attribute only ordinary skill to him who first sought the solution of the problem of cheaper production. In fact, some of us have, I fear, at times assumed that an understanding of the machine or product and its working by us, necessarily, invites the conclusion that there was no invention in the production of it. For, it is argued, if one untrained in the art can understand the problem and the new combination which solved it, invention can hardly be attributed to him who produced it. In other words, the knowledge of one skilled in the art must be much greater than that of the judges who comprise the court which passes upon the invention, and that, if the latter understands it, the former can hardly be classed as an inventor because he conceived it. While we would not willingly admit the existence of such views, they unconsciously manifest themselves in some of our decisions overthrowing patents. It is only when we feel quite clearly satisfied that the contribution was that of a mechanic skilled in this particular art, rather than the product of him engaged in the higher and more difficult task of new conception designed to meet an unsolved problem, that we are justified in rejecting the action of the Patent Office and the District Court.

The facts in this case, however, convince us that it was mechanical skill only which was contributed by the men who applied for this patent.

The decree is reversed, with directions to dismiss the suit.