### W. A. BAUM & CO., Inc., v. BECTON, DICKINSON & CO., Inc.

#### No. 4634.

District Court, D. New Jersey.

Sept. 11, 1937.

Wilfred B. Wolcott, of Camden, N. J. (Paul Synnestvedt, Harvey Lechner, and Arthur Synnestvedt, all of Philadelphia, Pa., of counsel), for plaintiff.

Briesen & Schrenk, of New York City (Hans v. Briesen and Fred A. Klein, both of New York City, of counsel), for defendant.

FORMAN, District Judge.

This is a suit for infringement of letters patent No. 1,821,902, covering a manometer for the measurement of pressure or vacua in fluids, or of differences in pressure or in vacua between several points in fluid systems. More particularly the invention relates to an improvement in so-called sphygmomanometers, or apparatus for the indirect determination of blood pressure. The parties hereto say that the instrument in suit, the mercurial gravity type, has in effect supplanted the aneroid type of instrument, an instrument relying upon the yield or spring of metal for its functioning, because the latter has the defect of losing accuracy in use.

Dr. Andrew F. Currier in the Encyclopedia Americana, volume 4, p. 111

(1937), describes the development of the sphygmomanometer in the following language:

"Measurement of the pulse or blood pressure is a procedure of comparative recent recognition. Its importance was observed in Europe as early as 1828 but it was not until 1876 that the first sphygmomanometer was made in this country, being that of Marey, which for a considerable period of time was used principally in physiological investigations and experiments. The second period began in 1896 with the apparatus of Rivi-Rocci, which consists of an inflatable rubber bag or cuff, 5 centimetres in width, surrounded by a band of firm cloth, which is wound around the arm. To this is attached a rubber tube connected with a reservoir of mercury, from which proceeds an upright glass capillary tube, by the side of which is a wooden scale graduated in millimetres. The rubber bag is placed over the brachial artery above the bend of the elbow, secured by the band wound around the arm and inflated by means of a rubber bulb and tube until the pulse at the wrist has disappeared. As soon as the column of mercury comes to a rest the point on the scale is noted and this is the maximum or systolic pressure. The air in the bag is then gradually released until the pulse clearly reappears and this becomes the minimum or diastolic pressure.

"Many mercurial manometers have been devised since Riva-Rocci's, but they are only modifications of his. Among the mercurial instruments which are worthy of mention and reliable are Cook, Stanton, Janeway and Nicholson."

Or, as Dr. Logan Clendening more entertainingly describes the history of blood pressure in his book, "Behind the Doctor," at page 200, (1933).

"Blood-pressure! Gentle reader, if you have lived to adult life in the twentieth century, you must have heard of that. Somebody in your circle of acquaintances must be either proud or ashamed of his blood-pressure. Yours must be either too high or too low or just right. Gaze reverently, then, on the countenance of the perpetual curate of Teddington, the Reverend Stephen Hales, who invented the blame thing.

"The Reverend Stephen, of course, had none of our modern instruments for measuring this pressure. He used the direct method—actually observing how high a column of blood would rise in a tube tied into the blood-vessel of an animal.

"The first blood-pressure observations were made in 1710. Afterwards Hales experimented on 'two horses and a fallow Doe.' His first experiment on horses he records thus: 'In December I caused a mare to be tied down alive on her back; she was fourteen hands high, and about fourteen years of age, had a Fistula on her Withers, was neither very lean, nor yet lusty. Having laid open the left crural Artery about three inches from her belly, I inserted into it a brass Pipe, whose bore was one-sixth of an inch in diameter; and to that, by means of another brass Pipe which was fitly adapted to it, I fixed a glass Tube of nearly the same diameter, which was nine feet in Length. Then untying the Ligature on the Artery, the blood rose in the Tube eight feet three inches perpendicular above the level of the left ventricle of the Heart.'

"Following Hales's work the next advance in the study of blood-pressure was the description by Jean Louis Marie Poiseuille, in his graduating dissertation in medicine in 1828, of a haemodynamometer. This instrument measures the pressure by direct insertion of a cannula into the blood-vessel, just as Hales's did, but it substituted a mercury column for the column of blood. Twenty years later, in 1847, Carl Ludwig added a float on the top of the mercury column and caused it to write on a recording cylinder, thus, as Stirling says, giving us at one coup 'the kymograph or wave writer, and the application of the graphic method of physiology.'

"These measurements were all made on animals. The first record of the blood-pressure in man was made in 1856 by Faivre, who did as Stephen Hales did on his mare—he inserted a tube in the femoral artery of a man during an operation for amputation of the leg, but instead of measuring the height of the column of blood, he read the pressure as recorded on a column of mercury—it was 120 millimetres, the standard we still use as 'normal' for the systolic pressure.

"Vierordt and Marey about the same time used methods which did not necessitate the exposure of an artery. They were cumbersome, however. Marey's instrument required that the whole arm be immersed in water.

"In 1896 Riva-Rocci demonstrated the instrument with the cuff encircling the

arm connected with the mercury manometer, which remains, with a few minor improvements, as the standard instrument of today, upon which the glazed eyes of millions of candidates for life insurance have been fixed."

Dr. Theodore C. Janeway, in his book, "The Clinical Study of Blood-Pressure (1907)," in chapter IV entitled, "The Modern Sphygmomanometers," carefully describes a number of instruments beginning with Riva-Rocci's.

William A. Baum engaged in the business of manufacturing manometers in 1916. He incorporated the business under plaintiff's name in 1918. The defendant, which for some years had been engaged in the manufacture of physicians' equipment, such as thermometers, stethoscopes, etc., began making manometers about 1921, for a short time producing the U-type all glass instrument so that prior to 1923 both parties were manufacturing the latter type of instrument.

The defendant alleges that in 1922 it decided to manufacture manometers of metal because it says that it recognized the fact that, by making as many parts as possible of metal, the parts would be entirely alike, interchangeable, and could be manufactured in large quantities. The first of the new type of instrument of the defendant was introduced in the market in 1923. It was made in several types, including both boxed and pocket styles (Defendant's Exhibit O).

Plaintiff departed from the U-type device when it marketed its lifetime baumanometer (Exhibit L) in 1926. This has all of the characteristics of the patent in suit which plaintiff filed March 9, 1927, and which was issued to him September 1, 1931, under No. 1,821,902.

Plaintiff considers that its improvement is an important invention because physicians, the chief users, may make repairs on the spot without returning the instrument to the factory by reason of the fact that its accurately interchangeable tube is detachably supported as follows: The fixture, i. e., the portion connecting the reservoir with the measuring tube has a shouldered or stop seat on which there is a cork washer, and the lower end of the tube is pressed against this washered stop seat. At the top, the tube has a cap piece which allows egress and ingress of air from and into the tube during operation, so that, as the mercury rises within the tube, the air is pushed out without compression thereof and, as the column of mercury sinks in the tube, air is free to enter and prevent the formation of a vacuum—making the instrument a gravity type one. In order to prevent loss of mercury and to dampen the fluctuations of the mercury column within the tube, the cap piece is also provided with a piece of barometer kid which is sufficiently porous to allow the egress and ingress of air but at a rate such as to dampen the fluctuations of the column. Plaintiff provides a protruding dot on the bottom end of the measuring tube, which fits into a slot in the fixture. This protruding dot affords perfect position of the measuring tube, so that the user when inserting a tube will get the graduations directly in front and can hold the tube in place. The cork washer between the lower end of the tube and its seat, it is claimed, absorbs the axial stresses, and there is provided an annular celluloid band to absorb the radial stresses on the tube. This cork washer and celluloid band is located at each end of the measuring tube. The measuring tube is held in position by means of a spring attached to a slide, which is located perpendicular to it. The slide has a bent over or flanged portion at its top in which is located the cap, which fits over the upper end of the measuring tube. The cap, by reason of the spring, is thus caused to bear against the upper end of the tube and thrust it against its seat in the fixture, acting to make a liquid tight joint with the cork washers located at the bottom and top of the measuring tube. The measuring tubes are selected to fall within standard dimensions of bore and are calibrated while coupled with a master reservoir. Thus any of plaintiff's tubes can be inserted in any of these instruments, and they will be as accurate and as easily readable as before, because all reservoirs are of a standard size and every tube is individually calibrated to that standard. A new tube will occupy the same relation with respect to the balance of the instrument as did the tube for which it was substituted. The measuring tube is divorced from the measuring scale, which is located directly behind the tube. The scale has a series of numbers on its right and left side. In its middle there is a groove in which the measuring tube is placed.

For the prevention of the escape of mercury during shipment plaintiff utilizes an obstruction consisting of a cork disc,

710

interposed between the end of the measuring tube and the duct from the reservoir, with a string or tab attached to it to make it easily removable.

Plaintiff alleges that the defendant, Becton, Dickinson & Co. has infringed its patent, and further alleges unfair competition, in that the infringement of the Baum patent was aggravated by imitating the form, color, structure, dimension, material, and dress of the plaintiff's patented manometers and that persons purchasing manometers have learned to identify plaintiff's products by their distinctive appearance.

The defendant's devices before the court are six in number and are marked Exhibits A, C, D, defendant's armored, interchangeable tube type, and Exhibits E, F, and G. Exhibits A, C, and D are provided with a screw cap at the top for making a tight joint for the tube. Exhibits E, F, and G also utilize a screw-threaded arrangement for making a mercury-tight joint, but the threaded member comprises a ring which creates traction at the bottom portion of the tube by pulling downwardly on a collar which is secured to the bottom of the tube. None of the defendant's devices utilize the plate and spring arrangement of plaintiff's patent. In each of the Exhibits A, C, and D the tube comprises a short stub section which is secured permanently in a collar at the bottom of the instrument and a longer section which has a ground fitted into the stub section and the two portions of the tube are held in relation by the cap at the top which is provided with screw threads. All of these devices have a reservoir, a glass tube, a fixture which is provided with a duct establishing communication between the reservoir and the glass tube, a glass tube having graduation marks thereon and associated numerals and a cap at the top which contains a disc of gauze, barometer kid, and a washer. The bottom of the longer section of the tube in Exhibits A, C, and D ends at about the figure 20 on the scale and fits into a short or stub tube which is permanently attached to the fixture. The lower calibrations down to zero are on this stub tube. In Exhibits E, F, and G the bottom of the tube is equipped with a threaded ring permitting it to be drawn into position by a knurled nut so that when tightened by this means contact with the reservoir is established. In order to ship the instrument with the mercury within the reservoir until the instrument reaches the hands of the ultimate user, defendant also utilizes a cork or bakelite stopper to prevent the free movement of the mercury into the measuring tube.

It is a stipulated fact that the defendant ceased the manufacture of instruments of the types of Exhibits A, C, and D upon receipt of notice of infringement by it, but continued to sell from its stock on hand.

Following is a discussion of the claims as applied to Exhibits A, C, and D upon which the plaintiff relies. Such claims as are not susceptible of distinction from other claims, or constitute a reiteration thereof, are omitted.

Claim 5 among other things refers to "a cap independent of and disconnected from the reservoir affording communication with atmosphere and movable toward and away from the fixture, means supporting the cap whereby it may be moved toward and away from the fixture." This claim, considered with the specifications, refers clearly to the spring device located at the top of the measuring tube, which presses the tube downwardly against the cork washer in its seat. The defendant does not utilize the spring clamp device, but follows the method used in the Schaeffer and Bundenberg device; that is, defendant has a screw cap, which when turned home presses the measuring tube down against its seat. The utilization of a spring clamp as a means of attaching the measuring tube securely to its seat, whereby the tube may be more readily detached and replaced, would readily suggest itself to any one skilled in the art, and does not in the court's opinion rise to the dignity of a patent. Boss Manufacturing Co. v. Thomas, 182 F. 811 (C.C.A.8th). It is a matter of common knowledge that the use of a spring clamp as a means of uniting or attaching together two or more pieces or parts of material was well known long before the issuance of the patent in suit. It does not appear to the court that the spring clamp in lieu of the screw cap device effects any new functional result. Its use is merely another means of obtaining the same result as the Schaeffer and Budenberg instrument would demonstrate. In the prior art every feature relied upon by the plaintiff, excepting the spring-cap arrangement, is contained in the Schaeffer and Budenberg device, which shows (1) a reservoir for containing a measuring liquid; (2) a fixture; (3) a cap; (4) a support

for the cap; and (5) a removable measuring tube.

Claim 5 also makes reference to "a measuring tube detachably interposed between the fixture and cap and adapted to be held in position by the latter." This particular feature of the claim involves no invention over the prior art, for a similar construction was utilized in the Schaeffer and Budenberg device.

Claim 6: This claim states that the reservoir is "standardized as to its internal diameter for containing the measuring liquid." Claim 20 among other things makes this addition: "a measuring tube * * * calibrated with respect to the said standardized reservoir." These claims were utilized in the Schaeffer and Budenberg device, whose reservoirs were all cast to like dimensions. The tubes were specially selected by the use of steel gauges so that the bore of the tubes should have a definite relation with respect to the reservoirs. The defendant's tubes are selected in the same manner as the Schaeffer and Budenberg tubes. This claim involves no invention over the prior art, for it has long been known that the size of the reservoir must bear a definite relation with the size of the tube bore.

Claim 7 refers to "washers at the end of the tube." There is no novelty or invention in this claim, because washers were interposed at each end of the measuring tube in the Schaeffer and Budenberg device.

Claim 9 makes reference to "shock absorption bands mounted on the tube and disposed between the same and the adjacent wall." At each end of the plaintiff's measuring tube there is a celluloid annular band. It is stated that the purpose of this band is to absorb radial stresses. The defendant does not use such a construction in his device. The court does not observe any patentable ingenuity in this. No special provision is made to absorb shock other than the firm union of the tube in position.

Claim 14 alludes to "an obstruction blocking communication between the fixture and tube and retained in place by such tube." This "obstruction" in the Baum patent consists of a disc of cork, interposed between the end of the tube and the duct from the reservoir. This disc of cork is provided with two strings, by which it may be lifted from over the duct. Its use is shown in Dr. Janeway's book of 1907 (Exhibit D.5) p. 88. This book gives a graphic illustration of the Stanton manometer in use at that time, and this explanation: "the upright glass tube is unscrewed, and its place filled by the cap (which serves the same function as the cork obstruction in the case at bar) for the purpose of carrying the apparatus around." Here again there is no patentable invention in the use of cork obstruction in the light of the prior art.

Claim 17 makes reference to "means associated with the cap and disassembled from the tube for preventing the escape of the measuring liquid from the tube when the latter is in place in the instrument and permitting the flow of air in the measuring tube above the measuring liquid." The "means" that plaintiff actually adopted in this connection was barometer kid. This, however, involves no invention because it was used in defendant's manometers Nos. 5010 and 5012, prior to the patent in suit.

Claim 26 alludes to "a box for containing and carrying the sphygmomanometer, a cover for the box capable of movement to an open position with respect thereto." This claim is also met by the defendant's instrument No. 5005 in which the device was incorporated on the cover of a box. The claim, therefore, involves no invention over the prior art.

Claim 31 refers to "a scale partially surrounding the tube and with reference to which the tube is removable." The answer to this claim is found in the Stanton device. In that instrument there was a groove in the scale, and the measuring tube fitted into that groove. Thus it seems apparent that there can be no patentable invention in this, in view of the status of the prior art.

The material claims of Baum's patent as applicable to Exhibits E, F, and G will now be discussed.

Claim 18 directly involves the feature that the means which permits flow of air and prevents escape of mercury is a member separate from the member, which, while itself a piece separate from the tube, presses or thrusts the tube against its seat, that is, the spring-cap arrangement. The claim also alludes to "stress absorbing means between the tube and fixture"; that is, the celluloid band. Both these phases of the claim have been considered in connection with Exhibits A, C, and D, and for like reason are void.

Claim 19 makes reference to "means between the tube and fixture absorbing stresses exerted radially and axially"—the rubber washers and celluloid bands. For reasons pointed out in connection with Exhibits A, C, and D, these claims are also void.

Claim 20 refers to "the combination of a reservoir standardized in respect to its internal diameter," and "a measuring liquid," each of which was utilized in the prior art as exemplified by the Schaeffer & Budenberg device, "a measuring tube for the measuring liquid calibrated with respect to the said standardized reservoir." The measuring tube in the Schaeffer and Budenberg device bore a definite relation with the reservoir, but was not individually calibrated. Individual calibration, however, involves no addition to the prior art on the subject as such was utilized in the Stanton device before the court. Claim 20 further makes reference to "such tube constantly communicating with atmosphere during normal operation of the instrument, means affording communication between the tube and reservoir and with reference to which the tube is detachably connected for interchanging with another tube, means whereby when the tube is placed under pressure a liquid tight connection will be made between the reservoir and tube," each of which was utilized by the Schaeffer & Budenberg device, and "means independent of and disconnected from the reservoir for placing the tube under pressure," that is, the spring-cap device, which has been discussed in connection with Exhibits A, C, and D, and for like reasons the court holds that such an arrangement does not merit patentability.

Claim 21 adds to claim 20 that pressure is exerted axially upon the tube. Axial pressure was applied in the Schaeffer & Budenberg device by means of the screw cap at the top of the measuring tube. This creates no addition to the prior art.

Claim 22 adds to Claim 20, "means independent of and disconnected from the reservoir for placing the tube under pressure longitudinally of itself." This refers to the spring clamp arrangement and for reasons hereinbefore discussed involves no invention. Claim 22 also makes reference to "means whereby when the tube is placed under pressure a liquid tight connection will be made between the reservoir and the measuring tube"; that is, the washers, and, for reason pointed out before, this involves no invention.

Claim 23 is like claim 20, but specifies that the tube is calibrated while coupled with a master reservoir. For reasons discussed in connection with this claim as applied to Exhibits A, C, and D, this claim is void.

Other claims of plaintiff are merely elaborations or repetitions of those discussed above.

In short, devices for the measurement of pressure or vacua in fluids, or of differences in pressure or in vacua between several points in fluid systems and for the indirect determination of blood pressure, had been fully exploited long before the plaintiff's patent. It is true that the Schaeffer & Budenberg device was not designed to measure blood pressure. Nevertheless, blood pressure could be measured by it. Structurally, it embodied standard reservoirs all made alike, a fixture, a glass tube selected by internal guage measurements so that the tubes would be substantially alike, a back plate or shield rising from the reservoir and fixture, having graduations thereon; an upper support for the tube, a cap, screw-threaded with respect to the upper portion of the back plate or shield, a washer beneath the lower end of the tube and a washer between the upper end of the tube and the screw cap, whereby the tube may be held in place and a mercury-tight connection made. The reservoir is provided with a tube connection in the top of the reservoir for connecting the manometer with the source of pressure. The testimony of one witness (Mr. Beck) was that the plaintiff's and the defendant's devices are all built on the same scientific principle as the Schaeffer & Budenberg device. An actual test of blood-pressure was made on the Schaeffer & Budenberg device in the courtroom with results that were "close."

Aside from this device, instruments directed solely to the measuring of blood pressure, and developing every basic theory found in the plaintiff's patent, were known to the plaintiff and the world, as for instance well known Stanton, Janeway, and other devices.

In the light of the knowledge of these prior instruments, the claims of the plaintiff for the spring cap, the means for permitting ingress and egress of air in and out of the measuring tube, the cork washers interposed at the top and bottom of the measuring tube, the annular celluloid bands

at the top and bottom of the measuring tube, the method of calibration, the cork obstruction utilized as a means to prevent the free movement of the mercury into the measuring tube during shipment or carriage, the standard reservoir, and the means by which the groove in the measuring scale partially encircles the measuring tube, and the combination of the box for carrying the instrument are the mere exercise of the skill of the calling or an advance plainly indicated by the prior art.

Long experience with these devices and industry in the desire to market its product to the best advantage led it to enhance its appearance so as to make it more attractive to handle. It exploited the removability of the measuring tube. It made its apparatus compact. It made it less easy to break and more convenient to use. It developed it on the æsthetic side, so that it was better to look upon. But it did nothing to improve the end result, namely, the measuring of blood pressure, by anything that can be termed inventive genius. Certainly the right to exercise its mechanical skill in this direction is to be accorded to the plaintiff, but not to the exclusion of others to act in the same manner.

In the case of Florsheim v. Schilling, 137 U.S. 64, 77, 11 S.Ct. 20, 24, 34 L.Ed. 574, the court said:

"The argument is advanced that the combination in this corset of the prior inventions secured and put into use by prior patents, making it a superior and cheaper article, is itself a patentable invention. We are unable to agree with appellants' counsel on this point. In Pickering v. McCullough, 104 U.S. 310, 318, [26 L.Ed. 749], this court, speaking through Mr. Justice Matthews, said: 'In a patentable combination of old elements, all the constituents must so enter into it as that each qualifies every other. * * * It must form either a new machine of a distinct character and function, or produce a result due to the joint and co-operating action of all the elements, and which is not the mere adding together of separate contributions.' 'The combination of old devices into a new article, without producing any new mode of operation, is not invention.' Burt v. Evory, supra, [133 U.S. 349, 10 S.Ct. 394, 33 L.Ed. 647]. See, also, Hailes v. Van Wormer, 20 Wall. 353, [22 L.Ed. 241]; Reckendorfer v. Faber, 92 U.S. 347, [23 L.Ed. 719]; Double Pointed Tack Co. v. Two Rivers Manufacturing Co., 109 U.S. 117,

3 S.Ct. 105, [27 L.Ed. 877]; Bussey v. Excelsior Mfg. Co., 110 U.S. 131, 4 S.Ct. 38, [28 L.Ed. 95]; Phillips v. Detroit, 111 U.S. 604, 4 S.Ct. 580, [28 L.Ed. 532]; Stephenson v. Brooklyn Railroad Co., 114 U.S. 149, 5 S.Ct. 777, [29 L.Ed. 58]; Beecher Mfg. Co. v. Atwater Mfg. Co., 114 U.S. 523, 5 S.Ct. 1007, [29 L.Ed. 232]; Thatcher Heating Co. v. Burtis, 121 U.S. 286, 7 S.Ct. 1034, [30 L.Ed. 942]; Hendy v. Miners' Iron-Works, 127 U.S. 370, 8 S.Ct. 1275, [32 L.Ed. 207].

"In the light of these authorities, our judgment is that the appellants' patent No. 238,100 was for a corset that had been in long and publicly-known use, each part of it previously patented; that it involved nothing original in the construction of those parts, nor in their relation to one another, nor any change in the function of any one of them; and that the combination of them produced no original mechanism or device."

In the case recently before the United States Supreme Court, Altoona Theatres v. Tri-Ergon Corporation, 294 U.S. 477, 486, 55 S.Ct. 455, 458, 79 L.Ed. 1005, the court stated: "An improvement to an apparatus or method, to be patentable, must be the result of invention, and not the mere exercise of the skill of the calling or an advance plainly indicated by the prior art. Electric Cable Joint Co. v. Brooklyn Edison Co., 292 U.S. 69, 79, 80, 54 S.Ct. 586, 78 L.Ed. 1131. The inclusion of a flywheel in any form of mechanism to secure uniformity of its motion has so long been standard procedure in the field of mechanics and machine design that the use of it in the manner claimed by the present patent involved no more than the skill of the calling. See American Road-Machine Co. v. Pennock & Sharp Co., supra, 164 U.S. 26, 41, 17 S.Ct. 1, [41 L.Ed. 337]. Patents for devices for use both in the motion picture art and in the art of sound reproduction, notably the Holst, the Bell & Tainter, the Dragoumis patents, and the Edison application, already noted, plainly foreshadowed the use made of the flywheel in the present patent, if they did not anticipate it. The patentees brought together old elements, in a mechanism involving no new principle, to produce an old result, greater uniformity of motion. However skillfully this was done, and even though there was produced a machine of greater precision and a higher degree of motion constancy, and hence one more useful in the art, it was still the product of skill,

not of invention. Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L.Ed. 241; Grinnell Washing Machine Co. v. Johnson Co., 247 U.S. 426, 432–434, 38 S.Ct. 547, 62 L.Ed. 1196; Powers-Kennedy Contracting Corporation v. Concrete Mixing & Conveying Co., 282 U.S. 175, 186, 51 S.Ct. 95, 75 L.Ed. 278."

The plaintiff's suit must therefore fail for invalidity of the patent. In such view it is unnecessary to discuss the allegations of infringement upon the part of the defendant's instrument.

There is also an allegation of unfair competition, but the burden resting upon the plaintiff to prove this charge has not been carried by it. This product is purveyed to a very narrow class of consumers—practically all physicians—people who are or should be of more than usual intelligence, who would be expected to be capable of discriminating in their purchases. There has been no showing of confusion upon the part of the buying public. Hence the plaintiff's bill of complaint must be dismissed on this charge as well.

This memorandum is designed to meet the requirements of Equity Rule 70½ (28 U.S.C.A. following section 723), with regard to the filing of findings of fact and conclusions of law.