## BAKER v. STERLING ENGRAVING CO.

### Civ. A. No. 879.

District Court, D. Maryland.

July 18, 1941.

Morton P. Fisher, of Baltimore, Md., and Harold F. Watson, of Washington, D. C., for plaintiff.

Herman Shapiro, of Baltimore, Md., and Henry H. Snelling (of Snelling & Hendricks), of Washington, D. C., for defendant.

CHESNUT, District Judge.

Claims 4 and 5 of the patent in this suit (U. S. No. 2,207,449–Baker) are, I think, clearly invalid for want of novelty and invention. Claim 5 is the one particularly relied upon in this case by the plaintiff. It reads as follows: "5. Carriage stepping mechanism for the purpose described, including in combination, a bed, guide means thereon, a carriage adapted for movement along said guide means, means providing a plurality of accurately and equally spaced station stops adjacent one of said guide means, *a single means permanently fixed to said carriage to engage with any one of said stops to lock the carriage at the corresponding station,* and means to elevate said carriage above said bed to disengage said single means from any stop to permit carriage movement under control of said guide means." (Italics supplied.)

The patent is for a machine used in the process of photo-engraving. It is called a "step and repeat" machine in the trade. Such a machine was not of itself new in the art. It serves to perform but one step in the process of printing which appears on the outside covers of paper match books which customarily contain advertising matter and are generally given away freely by manufacturers and others for advertising purposes.

In his specifications, the patentee describes the alleged invention in this way: "This invention relates to photo-printing apparatus for use in photo-engraving work and, more particularly, to improvements in such apparatus whereby the transparent negative may be accurately and successively positioned at a plurality of spaced stations above a photo-sensitive metal plate for printing a plurality of identical positives on the plate, each exactly spaced from the other by a predetermined amount, so that the reproductions printed from the plate, after processing, can be automatically severed from each other with the impression properly positioned on each unit portion."

A mere reading of the claim, in connection with the specifications of the patent, at once raises at least a substantial doubt as to whether the particular features of the machine described are patentable in view of the evident mere combination of well-known mechanical devices or principles. The testimony in the case makes it quite clear that the patentee did not contribute to the art any new mechanical principle or combination of elements which could fairly be considered a new and useful improvement and invention within the contemplation of the patent law.

The plaintiff and defendant are both local Baltimore companies engaged in the same line of business—photo-engraving. The business of each is comparatively small, the plaintiff employing about fifteen employes and the defendant about nine. During the last few years the Maryland Match Company, also a local Baltimore industry, was a customer of both. The business of the Match Company is to manufacture books of paper matches principally for advertisers. It is itself a comparatively small factor in the whole match business of the country, 97% of which, it was said by counsel in this case, being represented by the Diamond Match Company and the Ohio Match Company. As the Maryland Match Company is a small competitior, it is natural that its production costs must be kept to a minimum. In 1937 it represented to the plaintiff that the cost of the photo-engraving made and sold to the Match Company would have to be reduced in order to enable the Company to meet competitive prices. The plaintiff, who became the patentee of the patent in this case, then gave thought to the question of how his manufacturing costs for the photo-engraving plates could be decreased. He conferred with salesmen of two corporations which built "step and repeat" machines, but found the prices asked too high. He then conceived the idea of a simpler machine that would answer his particular requirements. He thereupon explained to a representative of the Maryland Match Company, which had an associated machine shop, his general idea for such a machine. In his testimony in this case he described his conception as follows: "I wanted a bed, and we had to have a carriage moved along that bed. One of the essential parts of that carriage was that it must make a very accurate and positive stop so as to eliminate the possibility of a human being operating it going astray. And I told him the carriage should raise and lower. And I went into this thing in a rather general way, because I had thought considerably about it by that time."

The plaintiff says he gave some very rough sketches, which he could not describe at all, to Mr. Balton, the representative of the Match Company. The latter said he would have the machine made in their shop. In turn, Balton explained what was desired to his mechanical draftsman Heil, who prepared the drawings for the machine and then supervised its actual construction by a mechanic in the shop named Feldman. The machine was completely built in about a month and delivered at a cost of about $1,800 to the plaintiff. Thereafter on May 22, 1939, plaintiff applied for a patent on the machine which was subsequently granted. The plaintiff, the patentee, was not himself a mechanical draftsman, nor a qualified mechanic, and was not capable of preparing or even understanding the drawings and specifications mentioned. He had no part whatever in the design or construction of the machine except as above stated in giving his general outlined conception of what he wanted for his business. The drawings and specifications and claims of the patent were prepared by his patent attorney. The plaintiff states that his cost of production of the photo-engraving plates by use of the machine has been reduced to about one-half of his former cost; but the nature and reason for this saving in production expense will be discussed later.

After putting the machine into service the gross volume of the plaintiff's business with the Maryland Match Company was about $7,000 for 1938; $3,000 for 1939 and $1,500 for 1940. The defendant also did the business of photo-engraving plates for the Maryland Match Company, and in 1939 the Match Company stated to Mr. Graf, the president of the defendant company, that his price would have to be reduced. Graf then also considered the problem of how his costs could be reduced, and decided that he would have to get a machine which would be effective for that purpose. He knew in a general way that the plaintiff had some such machine but he never had seen it and his thinking about the problem was along somewhat different lines. He was introduced to the mechanic Feldman above mentioned, as a practical man who could produce a useful machine for him. Feldman agreed to have such a machine built, not in the machine plant associated with the Maryland Match Company, but by an entirely independent contractor. Feldman then made an agreement with Graf to build a machine to meet his purposes for $1,200. The work was completed and the machine put into use by the defendant. Shortly thereafter the plaintiff filed the infringement suit based on the use of Graf's new machine, after prior notice to the defendant.

To understand the particular function of the patented machine, it is necessary to

briefly explain the part it plays in producing the photo-engraving plates which are the product made and sold by the parties to this case respectively to the Maryland Match Company. The latter uses the plates for the purpose of printing pictures and legends or reading matter upon the outside covers of the match books. The process of producing these match books, so far as the printing of the books is concerned, is as follows. A sketch of what is to be reproduced by printing is made by an artist or penman. This is given to the photo-engraver. He makes photographic negatives of the picture and these negatives are then superimposed on a metal plate (copper or zinc) and by a familiar process known in the art of photo-engraving, by the use of light through the negative, and the subsequent application of acid to the plate, a positive picture or representation of the ultimate printed matter to appear on the match book, is etched in relief on the metal plate.

The only difficult feature of the work, and the one that prior to the machines in question was the most expensive feature of production, consisted in the necessity for "color separation" where the printing of the match book covers was to include two or more separate colors. Color separation in such work was not new. It could be accomplished in several different ways. Before the use of the machine in question the plaintiff's particular method of color separation involved expensive hand work on the metal plates. The whole of the ultimate printed matter was first reproduced on the metal plate. If three colors were desired, at least three complete photographic reproductions had to be made on the metal plate. Different portions of each of these then had to be cut away by hand so that in the actual printing different colored ink could be used, the match book covers being three times run through the press, so that the three separate colors would be reproduced in the final printed matter on the covers of the match books. In the actual final printing cardboard was used of a size sufficient to print ten separate match books at one time on one piece of cardboard; and then machines were used by the Maryland Match Company (which did the printing) to cut the whole cardboard into ten separate match book covers. In order to have each of the ten separate match books complete in itself with respect to the printing thereon and the printing properly spaced, it is apparent that very

accurate and careful alignment was necessary to be preserved between the ten separate reproductions on the metal plate which was used in the printing of the cardboard. Prior to the advent of the machine, this alignment was accurately and easily secured in the photographic negatives before they were superimposed upon the metal plate from which the engraving was made, and the positive reproductions on the metal plate by the etching and photographic process preserved the accurate alignment which was necessary. In this older process ten copies of the engraving were made upon one plate. But if the ultimate printing on the match book covers involved three separate colors, it was necessary to have at least thirty reproductions on the plate so they could be prepared afterwards for the three color inking above described. This involved hand work on the metal plates in thirty different places.

The method adopted by the plaintiff (itself not new in the trade) to avoid the necessity of this costly manual work was to separate the whole matter to be printed in the original drawing into as many parts as were to be represented by different colors. For instance, if three separate colors were to be used, there would be three separate sketches, each of that particular part of the ultimate printed matter represented by a particular color. A photographic negative of these three drawings was then taken on one film, the three being separated one from another, but in perfect alignment lengthwise. One copy of the photographic film thus produced, forming a long and narrow strip, was then super-imposed upon the engraving plate and one copy then positively reproduced on the plate. In order to produce ten separate positive reproductions on the same plate, the negative was then shifted down the plate and successively reproduced on the plate. This operation was repeated until the engraving plate had received ten separate reproductions of the three separate portions of the ultimate printed matter. The engraved plate was then in its final form delivered to the Maryland Match Company for printing on the cardboard which in turn had to be cut into ten separate strips.

The only purpose of the machine in the whole process was to secure an accurate alignment or registry, or, as it is termed in the particular mechanical art, "indexing" of the ten separate positive photographical-

ly engraved matter for the match book covers; and the necessity for this accurate alignment was to enable the cutting machines of the Maryland Match Company to cut the cardboard into ten separate strips of even size with printing thereon properly spaced.

The machines used by the parties consist principally of (1) a plate bed to hold the metal plate to be engraved; (2) and a carriage imposed thereon to hold the long and narrow photographic negative of the sketches, with wheels on the carriage running along either a raised or sunken track to preserve alignment, and mechanical means for positioning the carriage on the plate in successive positions so that the ten successive reproductions of the negative on the metal plate will be exactly parallel and evenly spaced. In order to secure this positive position of the carriage containing the photographic negative from place to place as it is moved horizontally along the length of the bed plate, small holes are placed in side metal pieces which run the length of the plate. These holes are evenly spaced equi-distant so that the ten reproductions of the negative will be evenly spaced and in alignment. So far it is not claimed that there was any novelty or invention in the machine. But the point is made for the plaintiff that the novel idea or principle consists in the "means" by which the carrier of the negative, as it slides along the tracks and its position is changed from place to place, is firmly held in place at each succeeding station. This "means" is what is described in the claim as " * * * *a single means permanently fixed to said carriage to engage with any one of said stops to lock the carriage at the corresponding station.*"

The single means referred to in the claim is more fully described in the specifications as follows: "Another feature of the invention comprises the use of cooperating pins and holes on the carrier and bed· for providing the final accurate relative location of the parts in their various positive positions, together with means for automatically locating the parts coarsely to provide automatic cooperation of the interlocking pins and holes when the carrier is lowered onto the table".

And it is also described in the detailed construction of the machine in this way: "The means for positively locating the carriage in its various positions along the track comprises a pin 60 mounted in each extension block 37 of the frame, and extending below the surface thereof a distance somewhat less than the amount of elevation imparted to the carriage by operation of the lever 53. These pins cooperate respectively with holes 61 one in each of the blocks 27. previously described as mounted in the grooves 26."

In simple language this means that a small pin is placed on the under part of the carriage so that when the carriage is moved a pre-determined distance, the pin will lock in the hole and the carriage be held firm without the possibility of further movement. One of such pins is furnished for each end of the carriage and interlocks with the corresponding hole on the side plates. The movement of the carriage from station to station over the metal plate is facilitated by a lever which raises the carriage or some portion thereof so that the pin will be elevated above the holes, and the carriage is then pushed along until the pin comes in contact with the next hole. It is claimed that the idea of permanently fixing the pin itself to the carriage is a new and novel mechanical principle. I cannot think that this involves invention. On the contrary it is a mere adaptation of a well-known mechanical principle to the special requirements for a particular machine. The same result could doubtless have been accomplished in a number of different ways. The one actually adopted was a normal, usual and well-known method which was well within the capacity of any mechanic skilled in the particular machine art. Indeed I think this is very succinctly and clearly demonstrated by the testimony of Heil· who designed the plaintiff's machine after being given some verbal instructions by Mr. Balton of the Maryland Match Company. As Heil put it in substance, "I did not apply for any patent on this machine because I had no idea it was patentable. So far as I was concerned it was mere routine work". In other words, what the plaintiff conceived was merely a device, of no real mechanical novelty, which would be useful for the particular kind of job that he had in mind. He explained·the idea very simply to Mr. Balton who in turn explained it to a competent mechanical draftsman, who, without any difficulty and following only routine methods, produced the drawings therefor and had the machine built by a competent

mechanic in the machine shop. It seems quite impossible to dignify Baker's contribution to this machine as an instance of inventive genius. Similarly when the defendant wanted a machine to do the same kind of work, he had no difficulty in having a competent mechanic properly build it; and Graf had no idea he was either infringing the plaintiff's patented machine or inventing one of his own.

The defendant's principal contention is that the plaintiff's patent is invalid; but it is also contended that the defendant's machine is not an infringement. It is true that there are differences as well as similarities between the two machines. Both use the permanently fixed pin referred to. The operation of the carriage of the two machines is somewhat variant and the pin is not located in precisely the same way in the defendant's carriage as in that of the plaintiff. The defendant says that the pin in its machine is not located in fact on the bottom of the carriage but on the woodwork containing the photographic negative which is itself carried by the metal framework. The defendant admits that if the plaintiff had a valid pioneer patent the defendant's device would be an infringement, on the doctrine of substantial equivalents, but points out that the plaintiff's patent is not only invalid but if valid at all is for the very narrowest kind of a particular mechanical pin. I think it unnecessary to discuss the question of infringement or the variation between the two mechanical structures because they are both merely different uses of a perfectly well-known mechanical principle, neither of which involves any novelty in function. Competent mechanical draftsmen and mechanics could and did as a matter of routine work produce both. Probably Feldman's production of the second machine was facilitated by the fact that a year or so theretofore he had built the plaintiff's machine, but there was no necessity for him to copy it or slavishly imitate it because the first was itself not novel in principle or application.

■ The facts of the case render unnecessary any extended discussion of the patent law. It is well established that a machine the construction of which involves only well-known mechanical principles and is easily within the competence of a skilled mechanic does not rise to the dignity of a patentable invention. Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438; Electric Cable Joint Co. v. Brooklyn Edison Co., 292 U.S. 69, 54 S.Ct. 586, 78 L.Ed. 1131; Rokap Corp. v. Lamm, D.C., 10 F.Supp. 219, 224; Id., 4 Cir., 85 F.2d 873.

■ A patent, when granted by the Patent Office, is, of course, entitled to the presumption of validity; but as the file wrapper of the patent in suit has not been put in evidence in this case, it is not apparent on what reasoning the Patent Examiner approved the grant of the patent. The particular distinguishing element of claim 5 which is chiefly relied on for the patentable novelty is such a simple and well-known mechanical device that it seems entirely unnecessary to review the numerous patents put in evidence by the defendant to show the prior art; but for illustration, reference may be made to the following: Kechler (1881) 245,726; Ahne (1893) 500,-046; Lawton (1901) 679,386; Koppe (1928) 1,795,653; and Huebner (1935) 2,-021,959.

Particular attention may well be given to the Huebner patent No. 2,021,959 which is the basis for the Lanston machine referred to in the testimony. This Lanston machine will do all, and much more than all, than the plaintiff's machine will do. It is, however, designed for much more elaborate and complex use than the relatively simple purpose of the plaintiff's machine. When Baker was considering how he could reduce the costs of manufacture, he got in touch with the makers of the Lanston machine whose salesman and engineer offered him their machine which would have served his purpose mechanically but was not bought by him because it was much too costly and he also said it was unnecessarily complicated and could not be operated economically for his particular work. Baker said that he did not get the idea for his machine from the Lanston representatives. And counsel for the plaintiff distinguishes the Lanston machine from the plaintiff's on the ground that the pin used in the Huebner patent is not stationary or permanently fixed but is a slidable instrument. But there are numerous instances in the prior art of pins used for this same general purpose which are permanently affixed to one member of the machine to engage with holes or notches in another element in order to positively position the two.

■ I conclude that claims 4 and 5 of the plaintiff's patent in suit are invalid for

want of novelty and invention. Counsel may submit the appropriate form of judgment for dismissal of the suit, with taxable court costs awarded to the defendant.