## TILDEN v. STANDARD SANITARY MFG. CO.
### No. 5862.

District Court, D. New Jersey.
Aug. 14, 1939.

Albert Sperry, of New York City (Walter H. Free and Mark N. Donohue both of New York City, of counsel) for plaintiff.

H. W. Backes, of Trenton, N. J. (Green & McCallister and E. W. McCallister, all of Pittsburgh, Pa., of counsel) for defendant.

FORMAN, District Judge.

This is a suit by Bert O. Tilden under his patent entitled, "Connection for Water Closet Combinations", No. 1,867,118, issued on July 12, 1932 upon an application filed November 10, 1931. This combination comprises the traditional earthenware bowl and watertank. The subject of this litigation, however, specifically involves the means by which the tank and bowl are held in intimate contact, and not the functional operation of the bowl and tank.

The following claims of the patent are in dispute:

"1. The combination with a water closet bowl having a housing at its rear end, and a flush tank mounted upon the deck of said housing, said bowl and said tank having registering slots, of means for clamping the tank to the bowl comprising T-shaped bolts adapted to extend downwardly through the bottom of the tank and said deck, nuts disposed in the slots of the housing to secure the bolts to the tank, and nuts engaging the bolts beneath the said deck to prevent separation of the tank and bowl.

"2. The combination with a water closet bowl having a housing at its rear end formed with longitudinal slots, and a flush tank mounted upon said housing, the bottom of said tank having openings that register with the slots in the housing, clamping devices adapted to extend downwardly through the corresponding slots of said bottom and the housing, said devices having T-heads to engage the top face of the bottom, threaded means interposed between the housing and the bottom of the tank to rigidly fasten the devices to said bottom and threaded means engaging the portions of the devices disposed inside of the housing to clamp and hold the tank in place.

"5. In combination with a water closet bowl having a rearwardly extending support provided with openings, a flush tank mounted upon said support and having a bottom formed with openings for registry with the openings of the support, clamping means extending through the openings and each having a part that seats upon the tank bottom, means disposed within the openings of the support to secure said clamping means to the tank, and means connected to the clamping means and engaged with the support beneath the latter to clamp the tank to the support".

Plaintiff alleges infringement of the above claims. Defendant's answer raises the issues of invalidity by reason of anticipation, prior invention, prior knowl-

edge and lack of invention; non-infringement and unclean hands.

The evidence discloses that in the latter decade of the nineteenth century it was the practice to support the tank on the wall directly above the bowl at a height of about five feet in order to effect an hydraulic head sufficient for the flushing of the bowl. Improvements in the course of the flushing water obviated the necessity of so much space between the tank and bowl. Hence, the tendency was to lower the tank to the point that it rested on the wall only a few inches above the bowl. The industry then recognized that the wall-supported tanks were objectionable in that the small space between the tank and wall afforded an excellent breeding ground for vermin, and a depository of filth. The industry responded to these objections with a water closet in which the tank was wholly unsupported by the wall. This prevented the collection of filth behind the tank, because this structure could be spaced from the wall, and, hence, the rear of the tank could be maintained as clean as the front. The tank and bowl, however, was a one-piece structure in which the tank extended upwardly from the rear of the bowl. The objections to this were that it was difficult to manufacture, heavy, expensive, and, of course, if there was any breakage of either the tank or bowl the whole structure became useless.

With this background in mind Tilden says that he conceived the idea that he could manufacture a water closet that would avoid the objections to the one-piece structure, but still retain all its advantages. He says his idea embodied a water closet in which a separate tank rested on the bowl firmly clamped and wholly unsupported by the wall of the room.

There is testimony indicating that Tilden's progress with this idea was retarded by two obstructions. First, he encountered difficulties in flushing the bowl by reason of the loss of hydraulic head occasioned by the lowering of the tank to the point that it rested directly upon the bowl. Secondly, he was confronted with the method by which the tank should be firmly clamped to the bowl.

The answer to these problems is the patent involved herein which may be described as follows: It has the external appearance of the conventional water closet. In order to support the tank the upper rear portion of the bowl is extended and forms a flat surface, a shelf or support for the tank, approximately ten inches square on a plane level with the rim of the bowl. The rear of this shelf has three apertures. There is a gap in the far side of the shelf through which a spud connection, in which water passes between the tank and bowl, is inserted. This spud connection is fitted at one end to an opening in the tank and at the other end to an opening in the bowl located several inches below the level of the shelf. On each side of this gap is an aperture which registers with apertures in the tank through which a bolt may be passed. The bolt connections are the means by which the tank is clamped firmly to the bowl, and their construction constitute the crux of the case. The heads of the bolts in the bottom of the tank are not exposed to the water. Instead, openings in the bottom of the tank are covered with mushroom-shaped, guard-shields of the tank material forming an integral part of the tank itself.

In order to fasten the tank to the bowl T-shaped bolts are first inserted from the bottom of the tank through the elongated apertures and are given a quarter turn so their heads will rest upon the sides of the apertures at right angles. Afterwards, a plain washer and a split ring washer are applied, and then a nut which is tightened, holding the bolt to the bottom of the tank in a rigid position. The tank is then placed upon the shelf of the bowl, and the projecting ends of the bolts are inserted in the openings of the shelf which are sufficiently large to encircle the bolts affixed to the bottom of the tank. After the tank is placed in position, non-metallic washers are affixed to the loose ends of the bolts, metal reinforcing plates, and, finally, wing nuts, which when tightened hold the tank and bowl firmly in intimate contact.

The testimony reveals that James A. Dorety collaborated with Tilden in the preliminary experiments leading up to the patent in suit, both of whom testified in the trial of this case.

Tilden's testimony discloses that he first made a bowl, and that it took months to overcome flushing difficulties produced by the loss in hydraulic head occasioned by the lowering of the water-tank to a point that it rested immediately upon the bowl. He then went to work on a tank. He stated: "We had to have a bowl

to hold the tank so we put an extended seat shelf on it, put two holes on it". He made many experiments before he worked out a means that would serve to hold the tank and bowl together. He first used an expansion bolt but that was abandoned "in very short order". He then experimented with a toggle bolt, and later with a T-bolt. But, he says, "We were suspicious or fearful of the strength that the bottom of the tank might hold, so we made a, what we term a fish plate". (The so-called fish plate apparently was only a sheet of brass which fitted between the tank and the bowl.) Continuing, he testified, "We abandoned the fish plate for two reasons. It took up too much room between the tank and the bowl. It was too expensive. It was heavy. And we believed that from that experience or that experiment that the bottom of the tank was what we were trying to strengthen, so then we devised an idea of covering the head of the bolt with a china piece which would be equivalent to adding to the thickness of the bottom of the tank, it would strengthen the hole and at the same time make it foolproof and water tight, so we put a mushroom over the top of the T-head and that strengthened the space around the bolt, also made it foolproof from water leakage".

Dorety likewise testified that they first experimented with a bowl using a regular tank, but that "it developed cracks down the pour hole, real fine cracks". He later admitted, however, that the cracks resulted from faulty workmanship rather than as a result of pressure exerted by the means used to connect the tank with the bowl. He also corroborated the experiments with the regular square headed bolts, toggle bolts, T-head bolts and the fish plate. He stated, "We were afraid of bolting a tank on a bowl. We were afraid of friction and cracked ware. Up to then it was history that you couldn't bolt pieces together like that, so I remember Mr. Tilden taking hold of that tank and shaking it, he said, 'If you don't get that good and tight somebody will come along and shake it like that and you have got a leak'. So between us we thought up this fish plate as giving us a good flexible joint. Well, we did away with that. I don't know why. After a while we got on to the fact that we could do without the fish plate and still get a good joint".

With reference to the experiments with the different bolts he stated that there was no reason for abandoning the square bolt, "It didn't give us trouble other than we wanted to keep it leakproof and we knew if we went through there, through the bottom of the tank without any protection we were going to have trouble. That is why we abandoned it, I guess".

He also testified that the mushroom-shaped shields were used in order to prevent leaks, and that the use of a T-bolt was necessary in the construction finally adopted.

It is to be reiterated that we are only concerned with a connection for a water closet combination. Whatever skill may be involved in overcoming the flushing difficulties encountered in the experimental stages of the patent in suit is foreign to the issue herein. In fact, Tilden has a separate patent (Tilden Re-issue Patent 18,065) which issued May 12, 1931 prior to the patent at bar covering a bowl which overcame the flushing difficulties produced by the loss in hydraulic head occasioned by the lowering of the tank. Tilden also testified that there were no flushing difficulties in the one piece water closets, and they were on the market prior to his invention. Dorety testified that the flushing difficulties were solved when Tilden worked out the jet construction of the Re-issue Patent 18,065. Furthermore, the claims in suit do not relate to the flushing mechanism. Eliminating these difficulties, it is apparent that the only problem Tilden solved was the clamping means by which the tank and bowl are held in intimate contact. Does this constitute inventive genius?

It is appropriate at this point to consider the prior art on the subject in answer to this question. Defendant cites the Wallace Patent 558,130 issued in 1896 which not only discloses the idea of removing the tank from the wall and wholly supporting it on the bowl, but also the use of bolts to clamp the tank in place on the bowl on a rearwardly extending seat shelf having therein various apertures for receiving the clamping bolts and flushing-water connections. Plaintiff differentiates this citation on the ground that the tank of the Wallace patent is made of wood whereas the tank in the Tilden patent is made of porcelain. The Wallace patent contains the following statement: "When the reservoir is separated from the closet, it is constructed of wood or other suitable material and lined with metal and

must be secured by bolts or other means to the closet; but when made of porcelain it is cast integral with it".

Hence, plaintiff contends the Wallace patent does not disclose a method by which a porcelain bowl can be clamped in intimate· contact with a porcelain tank.

The patent to Barr No. 947,782 of February 1, 1910 discloses a bolted-together tank and bowl combination in which the tank is supported on and secured to a rearwardly extending shelf of the bowl. Plaintiff distinguished this citation on the ground that the tank is not only supported. by the bowl, but is also attached. to the wall.

The British patent issued to Twyford, May 7, 1923 does not concern water closets, but does disclose the fundamental idea of clamping two pieces of earthenware together. This patent covers a pedestal-mounted lavatory in which there is a circular recess in the bottom of the basin, the upper or inner end of which is enlarged at opposite ends for the purpose of receiving a T-bolt. The bolt is inserted and given a quarter turn in the same manner as in the Tilden patent. A nut is then affixed to the bolt, and serves to hold the bolt in a secure position.

The pedestal is hollow, but is provided with an extension at its top which acts as a seat for the basin which is mounted thereon by inserting the free end of the bolt into an aperture in the so-called seat. A washer is then affixed to the free· end of the bolt, and finally, the pedestal and basin is held in a rigid position by means of a wing nut. Plaintiff points out that the basin rests not only upon the seat of the pedestal, but is also supported by the wall of the room in which the fixture is located.

This court is of the opinion that this patent is invalid for two reasons. First, the prior art is suggestive of the fundamental idea involved. Secondly, the improvements over the prior art do not demonstrate the requisite mechanical ingenuity which would warrant an exclusive privilege.

The Wallace patent of 1896 suggests a combination water closet in which the tank rests upon a rearward extension of the bowl clamped together with bolts and nuts. To this, plaintiff's only response was that the description of the Wallace patent states that the tank and bowl must be cast integral unless the tank is made of wood. Fundamentally, plaintiff has substituted a porcelain bowl for the wooden bowl of the Wallace patent. He "discovered" that the prohibitions of the Wallace description were unfounded. Hence, he claims a patentable invention.

Plaintiff, of course, has overcome the necessity of bracing the tank to the wall as was done in the Barr patent of 1910. Nevertheless, the fundamental idea was disclosed therein.

The Twyford patent of 1923 as hereinbefore described does not involve water closets, but it does present a striking analogy to the patent in suit to the extent that the T-bolt arrangement is involved.

With reference to plaintiff's variation from the prior art we cannot avoid the conclusion that the use of the mushroom guards was a simple expedient that would have occurred to the ordinary mechanic skilled in his profession. With the adoption of this device each step thereafter was self-imposed. The use of T-bolts was imperative. In fact, Dorety, Tilden's assistant, so testified. It was then necessary and self-evident that a nut affixed immediately beneath the tank should be utilized to hold the T-bolt in position. And, of course, by the very nature of things it was necessary that there be a support for the tank. This took the form of the rearwardly extended portion of the bowl on which the tank is placed. Finally, it was self-suggestive that the projecting ends of the bolts should be secured to the bowl. Hence, the use of the washers and wing nut.

The only thing that retarded a more rapid development of the sequence of events culminating into the alleged "invention" was the apprehension of breakage. Dorety testified as follows: "Up to then it was history that you couldn't bolt pieces together like that". It is reasonable to expect that the solution of this problem would be supported by evidence indicating that bowls and tanks actually cracked under this alleged unusual strain. Instead, however, there is no evidence indicating that such ever occurred. The only testimony offered in this connection was that they were "afraid of bolting a tank on a bowl", that they "were afraid of friction and cracked ware", and that they were "suspicious or fearful of the strength that the bottom of the tank might hold".

We are not unmindful of the testimony of the expert witnesses produced at the trial concerning the compression and tensile strength of porcelain. William H. Kelly, witness for defendant and manager of the Trenton plant of the American Radiator and Standard Sanitary Corporation, testified as follows: "Its tensile strength is very great, strong enough to resist any pull or strain that could be put on in any normal use.

\*   \*   \*   \*   \*   \*

"Compression strength is also very great".

Julius C. Hochman, witness of plaintiff, a Consulting Mechanical Engineer, testified that porcelain is very poor material to resist shock whether it be in compression or bending.

The relative strength of porcelain need not be argued. The fact is, however, that no unusual amount of pressure is exerted by the means of clamping the tank to the bowl, unless forces are exerted in opposite directions on the seat of the bowl and on the front of the tank. This could not happen in the normal use of the water closet. The court is inclined to agree with Kelly in his assertion that porcelain is strong enough to "resist any pull or strain that could be put on in any normal use". Consequently, it does not follow that any great problem was overcome by the use of the clamping means adopted.

■ The case falls within the confines of the case of Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438, which holds that it was never the object of the patent laws to grant a monopoly for every device which would naturally occur to any skilled mechanic in the ordinary progress of manufacture.

■ Thus far, the court has considered the claims as limited to a patented connection for water closets. Considerable emphasis has been made of the fact that the claims actually extend beyond a connection to include a combined tank and bowl, and that the patent includes the connection as well as the combination. Such an argument is not helpful to the plaintiff. It is admitted that the functional operation of the bowl covered by the patent in suit is protected by a prior patent, Tilden Reissue Patent 18,065. And plaintiff further admits that none of the elements constituting his invention "is necessarily new in and of itself". He does contend, however, that he has rearranged these old elements in such a way as to produce a new result. The court fails to see what that new result is unless it is the clamping of two pieces of earthenware together in intimate contact. The method used to accomplish this is old as already seen. Hence, plaintiff admittedly has combined the old art, and this court does not agree that his modification or rearrangement constitutes invention. On the contrary, the case falls within the following quotation taken from Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 486, 55 S.Ct. 455, 458, 79 L.Ed. 1005. "An improvement to an apparatus or method, to be patentable, must be the result of invention, and not the mere exercise of the skill of the calling or an advance plainly indicated by the prior art. Electric Cable Joint Co. v. Brooklyn Edison Co., 292 U. S. 69, 79, 80, 54 S.Ct. 586, 78 L.Ed. 1131. The inclusion of a flywheel in any form of mechanism to secure uniformity of its motion has so long been standard procedure in the field of mechanics and machine design that the use of it in the manner claimed by the present patent involved no more than the skill of the calling. See American Road Machine Co. v. Pennock & Sharp Co., supra, page 41 of 164 U.S., 17 S.Ct. 1 [41 L.Ed. 337]. Patents for devices for use both in the motion picture art and in the art of sound reproduction, notably the Holst, the Bell & Tainter, the Dragoumis patents, and the Edison application, already noted, plainly foreshadowed the use made of the flywheel in the present patent, if they did not anticipate it. The patentees brought together old elements, in a mechanism involving no new principle, to produce an old result, greater uniformity of motion. However skillfully this was done, and even though there was produced a machine of greater precision and a higher degree of motion constancy, and hence one more useful in the art, it was still the product of skill, not of invention. Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L.Ed. 241; Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U.S. 426, 432-434, 38 S.Ct. 547, 62 L.Ed. 1196; Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 186, 51 S.Ct. 95, 75 L.Ed. 278".

Plaintiff urges that a presumption of validity attached upon the issuance of his patent, which is strengthened by the fact that the file wrapper contains the principal

references to the prior art that are cited by the defendant in the present litigation.

█ It is true that the issuance of a patent per se carries with it some weight or judicial guidance. As stated in Radio Corporation of America v. Radio Engineering Laboratories, 293 U.S. 1, 7, 8, 55 S.Ct. 928, 931, 79 L.Ed. 163: "A patent regularly issued, and even more obviously a patent issued after a hearing of all the rival claimants, is presumed to be valid until the presumption has been overcome by convincing evidence of error. The force of that presumption has found varying expression in this and other courts. * * * The context suggests that in these and like phrases the courts were not defining a standard in terms of scientific accuracy or literal precision, but were offering counsel and suggestion to guide the course of judgment."

█ And there is the additional persuasive factor attendant · upon the examiner's rejection of references to the prior art, the same citations being made herein. Hildreth v. Mastoras, 257 U.S. 27, 32, 42 S.Ct. 20, 66 L.Ed. 112.

The references made by the examiner appear in a letter written by him to the plaintiff's attorney, the pertinent parts of which follow:

"This application has been examined.

"References made of record:

| Barr | 947,782 | Feb. 1, 1910 |
| Wallace | 558,130 | Apr. 14, 1896 |
| Twyford (Br.) | 204,225 | |
| | Accepted | Sept. 27, 1923 |
| Gaghan | 429,028 | May 27, 1890 |
| Tilden-Reissue | 18,065 | May 12, 1931 |

"Claims 3 and 4 are each rejected on the patent to Barr in view of the patent to Twyford. The patent to Barr shows a closet with a flush tank mounted in the rear thereof, the bowl and tank having registering slots, of clamping means comprising T-shaped bolts extending downwardly through the bottom and bolts for connecting the parts.

"The patent to Twyford shows a coupling comprising bolts with means carried by the bolts to clamp the parts together and means to lock the bolts and to apply this old form of locking means to the bolts shown in Barr would not amount to invention.

"As at present advised claims 1 and 2 may be allowed.

"Attention is further directed to the patents to Gaghan, Wallace and Tilden".

Needless to say, it is difficult to explain a mental attitude of the examiner. If this court knew precisely what problem he had in mind it would perhaps be persuaded by his disposition of the matter. It is apparent, however, from the above quotation that the examiner was not thinking about the same thing with which we are presently concerned. We do not know why he allowed claims 1 and 2, but rejected claims 3 and 4 on the basis of the Barr and Twyfords patents. The original of claim 3 and 4 reads as follows:

"The combination with a water closet bowl formed with a rearwardly extending shelf having upwardly facing slots, and a flush tank having its (a) bottom formed with semi-spherical chambers (projecting upwardly from the upper face of the bottom) and with slots that communicate with said chambers, of screw bolts to clamp the tank to the bowl, said bolts having T-heads adapted to be inserted upwardly into the said chambers, the bodies of said bolts thence extending downwardly through said shelf, means to prevent the bolts from rotating in said chambers, and means carried by the bolts and engaging the bottom face of the shelf to clamp the tank to said shelf.

"The combination, with a flush tank having chambered portions cast on (and projecting upwardly from the upper face of) its bottom and having slots communicating with said chambers, and a water closet bowl having a shelf at its rear end formed with slots that register with the opening of the tank, of clamping devices adapted to extend downwardly through the bottom openings of the tank and said shelf, said devices having enlarged portions that are disposed in and shielded from the flushing water by said chambered portion, (and which seat upon the upper face of the tank bottom) means to secure said clamping devices to the bottom of the tank, and independent means to lock the lower ends of said devices to said shelf and to draw the tank towards the shelf". (When the corrections and interpolations set forth in parentheses were made the claims were allowed.)

If claims 3 and 4 were rejected on the basis of prior patents, it is incomprehensible to us that a rephrasing of the claims would add patentable invention where none existed before. Particularly

is this true when the corrections and interpolations in the original claims amount only to a change in form and not in substance.

With reference to the so-called presumption which attaches to the issuance of the patent, this court concludes that any significance attendant thereto has been neutralized. Consequently, we are concerned only with the evidence presented herein. We are thereby moved to conclude that the patent is invalid. Hence, it will be unnecessary to consider the other issues presented herein.